**GRIMES PACKING CO. et al. v. HYNES, Regional Director, Fish & Wildlife Service, Department of the Interior.**

Civ. No. 5505.

District Court, Alaska, Fourth Div., Fairbanks.

July 18, 1946.

**44**

Medley & Haugland, Edward F. Medley, Frank L. Mechem, W. C. Arnold, and Bogle, Bogle & Gates, all of Seattle, Wash., and J. Gerald Williams, of Anchorage, Alaska, for plaintiffs.

Marvin J. Sonosky, Atty., Department of Justice, of Washington, D. C., and Harry O. Arend, U. S. Dist. Atty., and Wm. E. Berrett, Asst. U. S. Dist. Atty., both of Fairbanks, Alaska, for defendant.

PRATT, District Judge.

The following order creating an Indian reservation in the waters of Shelikof Strait is attacked as invalid by the plaintiffs in this injunction suit. The order reads:

"(Public Land Order 128)

Alaska

Modification of Executive Order Designating Lands as Indian Reservation

By virtue of the authority contained in the act of June 25, 1910, c. 421, 36 Stat. 847 as amended by the act of August 24, 1912, c. 369, 37 Stat. 497 (U.S.C., title 43, secs. 141-143), and the act of May 1, 1936, c. 254, 49 Stat. 1250 (U.S.C., title 48 sec. 358a), and pursuant to Executive Order No. 9146 of April 24, 1942: It is ordered, as follows:

1. Executive Order No. 8344 of February 10, 1940, withdrawing Kodiak and other islands, Alaska, for classification and in aid of legislation, is hereby modified to the extent necessary to permit the designation as an Indian reservation of the following described area;

Beginning at the end of a point of land on the shore of Shelikof Strait on Kodiak Island, said point being about one and one-quarter miles east of Rocky Point and in approximate latitude 57° 39' 40" N., longitude 154° 12' 20" W;

Thence south approximately eight miles to latitude 57° 32' 30" N;

Thence west approximately twelve and one-half miles to the confluence of the north shore of Sturgeon River with the east shore of Shelikof Strait;

Thence northeasterly following the easterly shore of Shelikof Strait to the place of beginning, containing approximately 35,-200 acres.

2. The area described above and the waters adjacent thereto extending 3,000 feet from the shore line at mean low tide, are hereby designated as an Indian reservation for the use and benefit of the native inhabitants of the native village of Karluk, Alaska, and vicinity:

Provided, That such designation shall be effective only upon its approval by the vote of the Indian and Eskimo residents of the area involved in accordance with section 2 of the act of May 1, 1936, supra: And provided further, That nothing herein contained shall affect any valid existing claim or right under the laws of the United States within the purview of that section.

Harold L. Ickes,

June 9, 1943 Secretary of the Interior."

Published in Federal Register of June 22, 1943, page 8557.

The authority mentioned in said order will be examined in detail:

1. Act of June 25, 1910; This act merely authorizes the President of the United States to withdraw public land for classification, etc.;

2. Act of August 24, 1912; This merely amends the first mentioned act by substituting for the words "minerals other than coal, oil, gas, and phosphates", the words "metalliferous minerals";

3. Executive Order No. 9146; Authorizes the Secretary of the Interior to sign orders creating reservations;

4. Act of May 1, 1936; It is by virtue of this act that the defendant claims said order was authorized.

It is obvious that the acts and executive order mentioned herein under 1, 2, and 3

will not constitute authority for Order #128.

Therefore, the Act of May 1, 1936, will be examined in detail.

Act of May 1, 1936, 49 Stat. 1250, 48 U.S.C.A. § 358a: The parts essential to this examination are; "That the Secretary of the Interior is hereby authorized to designate as an Indian reservation any area of land * * * together with additional public lands adjacent thereto * * *, or any other public lands which are actually occupied by Indians or Eskimos * * *; provided, * * * reservation shall be effective only upon its approval by * * *, Indian or Eskimo residents thereof * * *: Provided further, * * * nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, or other purpose whatsoever, or shall affect the rights of any such owner, * * * to the full use and enjoyment of the land so occupied."

The defendant relies on the case of Alaska Pacific Fisheries Co. v. United States, 1918, 248 U.S. 78, 29 S.Ct. 40, 63 L.Ed. 138. In this case the act of Congress making a reservation for the Metlakahtla Indians withdrew "the body of lands known as Annette Islands." It was interpreted to include the tide waters between the Islands and the land thereunder.

The Court arrived at this conclusion from the special facts of the case. 248 U.S. at pages 88, 89, 39 S.Ct. at pages 41, 42, 63 L.Ed. 138; "The purpose of the Metlakahtlans, in going to the islands, was to establish an Indian colony which would be self-sustaining and reasonably free * * *. They were largely fishermen and hunters, * * * and looked upon the islands as a suitable location * * *, because the fishery adjacent to the shore would afford a primary means of subsistence and a promising opportunity for industrial and commercial development. * * * The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. * * * The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory on soliciting the reservation. * * * Evidently Congress intended to conform its action to their situation and needs.

"* * * save for the defendant's conduct in 1916, the statute from the time of its enactment has been treated, as stated in the opinion of the Alaska court, by the Indians and the public, as reserving the adjacent fishing grounds as well as the upland, and that in regulations prescribed by the Secretary of the Interior on February 9, 1915, the Indians are recognized as the only persons to whom permits may be issued for erecting salmon traps at these islands."

It will thus be seen that the Court felt the facts of the particular case justified it in believing that Congress used the word "lands" in a technical legal sense, and not with the usual meaning.

Webster's International Dictionary, Second Edition, defines the usual and legal definitions of the word "land", to be;

1. A solid part of the surface of the earth as distinguished from water constituting a part of such surface, especially from ocean and seas.

2. (Law) Any ground and everything annexed to it by nature, as trees, water, etc.; or by man, as buildings, etc.

Bearing said definitions in mind, and also the long established rule "words in common use are to be given their natural, plain, ordinary, and commonly understood meaning, in the absence of any statutory or well established technical meaning, unless it is plain from the statute that a different meaning was intended, or unless such construction would defeat the manifest intention of the legislature," (59 C.J. p. 975), let us see if there is anything to indicate that Congress was using the word "land" in the Act of May 1, 1936, with other than its usual and common meaning.

In the Treaty of March 30, 1867, 15 Stat. 539, wherein Russia ceded Alaska to the United States, it is provided:

C.L.A. 33, p. 67.

"Article III.

"The inhabitants of the ceded territory, * * * if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall

be admitted to the enjoyment of all the rights, * * * of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country."

"Article VI.

"The cession of territory and dominion herein made is hereby declared to be free and unencumbered by any reservations, privileges, franchises, grants, or possessions, by * * * any parties, except merely private individual property holders; * * *."

The provision to protect the property of inhabitants other than the uncivilized ones warrants the inference that the uncivilized tribes had no property.

The covenant that the ceded property is free from reservations or possessions, except private property, negatives that the Indian tribes had any reservations or possessions that were binding upon the Russian Government.

In the case of Johnson and Graham's Lessee, v. McIntosh, 1823, 21 U.S. 543, at pages 584, 587, 8 Wheat. 543, at pages 584, 587, 5 L.Ed. 681, it states:

"Thus, all the nations of Europe, who have acquired territory on this continent, have asserted in themselves, and have recognised in others, the exclusive right of the discoverer to appropriate the lands occupied by the Indians. * * *

"The United States, then, have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. * * * They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy. * * *. All our institutions recognise the absolute title of the crown, subject only to the Indian right of occupancy, and recognise the absolute title of the crown to extinguish that right."

The statutes of the United States recognize the actual rights of occupancy of the Indians, but nowhere in the general laws do we find any special or exclusive rights granted to the Indians in the lands under the tide waters of the ocean, or right to fish therein. True, in some of the treaties such special rights were recognized in the tribes in question.

In the Act of May 17, 1884, 23 Stat. p. 24.

Providing a civil government for Alaska, the following is found with reference to Indians:

"Section 8. * * * That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress."

Section 12. That the Governor and two persons appointed by the Secretary of the Interior shall constitute a commission "to examine into and report upon the condition of the Indians residing in said Territory, what lands, if any, should be reserved for their use, what provision shall be made for their education what rights by occupation of settlers should be recognized, and all other facts that may be necessary to enable Congress to determine what limitations or conditions should be imposed when the land laws of the United States shall be extended to said district; * * *."

We see that Congress here treated the Indians of Alaska the same as the Indians of the States by recognizing their actual possessions.

It can be presumed that the commission to report upon the Indians pursuant to the Act of May 17, 1884, did its duty and that when the Act of June 6, 1900, making very comprehensive further provisions for the civil government of Alaska was passed, Congress had such report before it.

Said act, 31 Stat. 330, § 27, 48 U.S.C.A. § 356, sec. 292, C.L.A. '33 provides: "The Indians * * * shall not be disturbed in the possession of any lands [now] actually in their use or occupation. * * *"

We do not find in said act any recognition of the Indians having any rights to the lands under the seas or to fish exclusively in the sea. It must be presumed then that

the report of the commission did not show that any such rights existed in the Indians.

At the same session Congress was preparing the Act of June 6, 1900, for Alaska, it was preparing an act providing for the government of the Hawaiian Islands which had recently been annexed. In the Republic of Hawaii the owners of land abutting upon the sea were permitted to acquire vested fishing rights in the sea.

In the act of Congress "to provide a government for the Territory of Hawaii" 31 Stat. p. 160, approved April 30, 1900, appear the following:

Section 95, 48 U.S.C.A. § 506: All laws of the Republic of Hawaii which confer exclusive fishing rights * * * are hereby repealed, and "all fisheries in the sea waters of the Territory of Hawaii * * * shall be free to all citizens of the United States, subject, however, to vested rights; but no such vested right shall be valid * * unless established upon petition filed in a circuit court."

Section 96, 48 U.S.C.A. § 507: "If such fishing right was established, the Attorney General * * * may proceed in such manner as may be provided by law * * * to condemn such private right of fishing to the use of the citizens of the United States upon making just compensation."

Congress had in mind the unusual fishing rights enjoyed by the inhabitants of Hawaii, so it is probable inquiry was made as to whether or not the Indians of Alaska had similar rights.

It seems only logical to assume that the absence of any provisions concerning exclusive fishing rights in the natives of Alaska was intentional on the part of Congress and because it believed no such rights existed.

United States v. Ashton, C.C., 170 F. 509, at page 517, is as follows: "Any disposition of proprietary rights in the seashore by the government of the United States, being obnoxious to the firmly established principle that control of the seacoast is an attribute of sovereignty appertaining to the states, could only be valid, if at all, by virtue of the exercise of the power vested in Congress to be exercised for the national welfare, * * *. For the reasons already stated, the President could not grant shore lands by the making of an executive order designating the tract of land to be held as a reservation * * *."

In Shively v. Bowlby, 152 U.S. 1, at pages 11, 13, 14, 14 S.Ct. 548, at page 551, 552, 553, 38 L.Ed. 331, are the following statements:

"By the common law, both the title and the dominion of the sea, * * * where the tide ebbs and flows, and of all the lands below high-water mark, within the jurisdiction of the crown of England, are in the king. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the king's subjects. * * * It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high-water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention. * * * The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country. * * *"

In Mann v. Tacoma Land Company, 153 U.S. 273, at page 284, 14 S.Ct. 820, at page 822, 38 L.Ed. 714, it is stated: "* * * It is settled that the general legislation of Congress in respect to public lands does not extend to tide lands. There is nothing in the act authorizing the Valentine scrip, or in the circumstances which gave occasion for its passage, to make an exception to the general rule. It provided that the scrip might be located on the unoccupied and unappropriated public lands, but the term 'public lands' does not include tide lands. As said in Newhall v. Sanger, 92 U.S. 761, [763, 23 L.Ed. 769]: "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."

In United States v. Holt State Bank, 270 U.S. 49, at page 55, 46 S.Ct. 197, at page 199, 70 L.Ed. 465, it is stated: "* *

48

But as was pointed out in Shively v. Bowlby, [152 U.S. at] pages 49, 57, 58, 14 S.Ct. 548 [38 L.Ed. 331], the United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future states, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency. It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain."

In Section 2 of the Act of May 14, 1898, 30 Stat. p. 409, 48 U.S.C.A. § 411, Sec. 186, C.L.A. 33, Congress definitely expressed its policy toward Alaska with reference to tide waters: " * * * That nothing in this act * * * contained shall be construed as impairing in any degree the title of any State that may hereafter be erected out of the Territory of Alaska, or any part thereof, to tide lands and beds of any of its navigable waters, or the right of such State to regulate the use thereof, nor the right of the United States to resume possession of such lands, it being declared that all such rights shall continue to be held by the United States in trust for the people of any State or States which may hereafter be erected out of said Territory. * * "

In the first section of the White Act, approved June 6, 1924, 43 Stat. 464, 48 U.S.C.A. § 222, following authority to the Secretary of the Interior to create fishing areas and make rules and regulations therefor is found this limitation, to wit: " * * * Provided, That every such regulation made by the Secretary of Interior shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of the Interior. * * * "

Section one of the White Act, though reenacted without charge 44 Stat. 752, has never been expressly repealed or amended except to substitute the Secretary of the Interior for the Secretary of Commerce, 53 Stat. 1433.

If the Act of May 1, 1936, gives the Secretary of the Interior the right to make an area of the sea into an Indian Reservation, it thereby impliedly amends the White Act by giving an exclusive right of fishery to the Indians and by denying to citizens of the United States the right to take fish in an area of water in Alaska where fishing is permitted by the Secretary of the Interior.

■■ The rule of statutory construction is of long standing that no implied amendments or repeals will be adjudged except where clearly expressed and where no other reasonable interpretation can be made. Surely such cannot be said to be the situation with reference to the Act of May 1, 1936.

In the case of Freeman v. Smith, 9 Cir., 44 F.2d 703, the Territorial law required a $250 license fee from nonresident fishermen as against a $1 fee for resident fishermen. An action was brought to enjoin the Territorial Treasurer from enforcing said law and the Court said, after holding that the license fee was prohibitive (44 F.2d at page 704): " * * * It will thus be seen that the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska, where fishing is permitted by the Secretary of Commerce, is guaranteed to every citizen of the United States without reservation, whether he be a resident of Alaska or not; and the right so granted cannot be impaired or destroyed by the legislative assembly of the territory. If it can, the grant is an idle and empty one at best."

As the nonresident's fishing license law of Alaska was thus held to be invalid because its effect was one prohibited by the White Act, this case becomes strong authority for holding that the act of the Secretary of the Interior (LO 128), is equally invalid as it has the effect of destroying the right of plaintiffs and many other citizens of the United States to fish in the portion of the Pacific Ocean described in said order.

As the White Act guarantees the right of fishing without reservation, equally to a nonresident as to a resident, it must give the same guarantee equally to a white man as to an Indian, and thus, makes it impossible for the Secretary of the Interior to prohibit fishing in an area by white men by making it an Indian reservation.

■■ That the White Act merely expresses the common law in prohibition against exclusive fishing rights is shown by 36 C.J.S., Fish, § 6, pp. 837 and 838: "As a general rule all the members of the public have a common and general right of fishing in public waters, such as the sea and other navigable or tidal waters, and no private person can claim an exclusive right to fish in any portion of such waters, except in so far as he has acquired such right by grant or prescription, as discussed in § 9, infra."

To interpret the word "land" as used in the act of May 1, 1936, as including the water of the ocean, would be of the following effect to wit:

a. It would be contrary to the settled policy and law of the United States.

b. It would be contrary to the common law and to the common law interpretation of that term.

c. It would be in violation of the statutory rules of construction.

d. It would make the act change the common law and violate the rule that statutes in derogation of the common law should be strictly construed.

e. It would make said act an implied amendment of the White Act contrary to the rule of statutory construction.

f. It would convert said Act of May 1, 1936, into something not intended by Congress.

g. It would unsettle many property rights and illegally deprive persons of their property.

From all of the above, it appears that the word "land" as used in said Act of May 1, 1936, had the usual meaning and that neither said act nor any other act of Congress authorized the Secretary of the Interior to make Land Order 128 as far as it refers to the waters of Shelikof Strait.

As to the Fishery Regulation of March 22, 1946:

Said regulation is as follows:

Chapter I, Fish and Wildlife Service Department of the Interior

Sub-Chapter Q, Alaska Commercial Fisheries, Part 201 (Alaska Fishery General Regulation)

Section 208.23 Waters closed to Salmon fishing.

"(r) All waters within 3,000 feet of the shores of Karluk Reservation (Public Land Order No. 128, May 22, 1943), beginning at a point on the east shore of Shelikof Strait, on Kodiak Island, latitude 57° 32′ 30″ N., thence northeasterly along said shore to a point 57° 39′ 40″.

The foregoing prohibition shall not apply to fishing by natives in possession of said reservation, nor to fishing by other persons under authority granted by said natives."

Published in Federal Register, March 23, 1946.

As the shores of the Karluk Reservation in Kodiak Island are the lands between low and high tide of the waters of Shelikof Strait (Borax Consolidated v. Los Angeles, 296 U.S. 10, 56 S.Ct 23, 80 L.Ed. 9), the prohibited area of this fishing regulation is identical with the area of water of said strait included in said Land Order 128.

■ Counsel for defendant contends that even if the matters contained in the last paragraph of said fishing regulation are invalid, the regulation will nevertheless be sustained as one prohibiting any fishing whatsoever, as the first sentence so provides.

■■ While it is true that the Secretary of the Interior can, in the aid of the conservation of fish, absolutely close said area to fishing by anyone, it is clear that he did not do so. Said regulation must be viewed in its entirety. It leaves the right of fishing in the natives and their licensees and prohibits all others from fishing. It results in granting exclusive rights of fishing to the natives and their licensees; a thing that was explicitly prohibited by Section one of the White Act.

That the regulation is not in aid of conservation appears from the fact that it

**50**

does not limit in any way the quantity of fish which the Indians may take, nor does it limit the number of licenses they may issue, nor the number of fish that the licensees may take, nor the price that the Indians may charge for issuing licenses.

Said fishing regulation is contrary to the common and statutory law, and therefore is invalid, under the authorities cited hereinabove.

 Indispensable Parties Defendant:

That the United States and, or, the Secretary of the Interior are not indispensable parties defendant and that an injunction lies against the defendant in a case where an invalid regulation or order is the source of the defendant's authority, see: State of Colorado v. Toll, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927; Yarnell v. Hillsborough Packing Co., 5 Cir., 70 F.2d 435, 92 A.L.R. 1475; Berdie v. Kurtz, 9 Cir., 75 F.2d 898; Neher v. Harwood, 9 Cir., 128 F.2d 846, 158 A.L.R. 1116.

That officers acting under invalid regulations are subject to restraint by injunction, see also: Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764; International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293; Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733; United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570.

This cause came on for hearing upon the plaintiffs' complaint and affidavits, and upon the defendant's response to the order to show cause why a temporary injunction pendente lite should not be issued and affidavits in support thereof.

 From the law and facts as they appear to the Court, the plaintiffs are entitled to an injunction restraining the defendant during the pendency of this action as prayed for in their complaint. Said injunction shall be issued upon the bond heretofore filed in this case on the 26th day of June, 1946, and said bond shall be approved and continued as to any damages or costs arising by reason of said temporary injunction pendente lite.