**Donald Ungarook PETER, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**No. 2185.**

Supreme Court of Alaska.

Jan. 24, 1975.

Stephen R. Cline, Asst. Public Defender, Fairbanks, Herbert D. Soll, Public Defender, Anchorage, for petitioner.

Richard D. Burke, Asst. Dist. Atty., Catherine A. Chandler, Dist. Atty., Fairbanks, Norman C. Gorsuch, Atty. Gen., Juneau, for respondent.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

## OPINION

BOOCHEVER, Justice.

Upon being charged with the crime of burglary in a dwelling,[1] Donald Ungarook Peter moved to suppress from evidence certain items taken from him at the time of his arrest and a statement given by him to

1. A violation of AS 11.20.080.

Barrow, Alaska police officer Sage. The trial court denied the motion and a petition for review was filed. At the heart of Peter's motion is the broader question of whether the Uniform Alcoholism and Intoxication Treatment Act (hereinafter Uniform Act) as adopted by Alaska in AS 47.37 repealed by implication 13 AAC 02.175(c), which prohibits a person from being upon or along a highway while under the influence of an intoxicating liquor. Because the order denying the motion involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate review of the order may materially advance the ultimate termination of the litigation,[2] we granted review.[3] We also found that the substance and importance of the order justified deviation from normal appellate procedure so as to require the immediate attention of the court.[4]

We must first examine the facts under which the questioned evidence and statement were obtained. On the snowy, windy night of December 26, 1973 in the arctic city of Barrow, Alaska, officer Sage was met outside the police station by Mr. Nimrod Bodfish. Bodfish handed him two boxes of .22 caliber ammunition and a camera case which he advised had been dropped by Donald Peter. Based on additional information furnished by Bodfish, officer Sage went to look for Peter, fearing he was too drunk to be outside in the severe weather. On finding Peter, Sage observed him fall down, get up and start walking again. In response to Sage's question as to where he was going, Peter said he didn't know. Because of the weather conditions and his visual determination that Peter was very intoxicated, Sage ordered Peter into the back of his truck so as to take him to the jail for his protection. At this time, a box of .22 caliber shells fell out of Peter's pocket. In a routine search of Peter before placing him in the truck, Sage also obtained camera film and a couple of bottles of shaving lotion. He then drove Peter to the jail which was farther from the point at which Peter was picked up than was Peter's home. At the jail, Peter was again searched. The fruits of this search, an almost empty bottle of whiskey and more ammunition and shaving lotion, were placed in a paper bag for safekeeping.

At about midnight that same night, a burglary of Riley Kaleak's house was reported to Sage. Upon investigation, he ascertained that the missing items seemed to match those taken from Peter. Officer Sage then examined the property being held for Peter and noted that the "ammunition, camera box and other stuff" matched the items reported to have been stolen.

The following morning when Peter appeared to be sober, officer Sage advised him of his *Miranda* rights[5] and obtained a confession from him.

Petitioner contends that officer Sage did not make a legal arrest and that the taking of Peter's personal effects prior to placing him in jail constituted a search in violation of the fourth amendment to the United

---

2. Alaska R.App.P. 23(d) permits review:
   Where such an order or decision involves a *controlling question of law as to which* there is substantial ground for difference of opinion, and where an immediate and present review of such order or decision may materially advance the ultimate termination of the litigation.

3. Justices Fitzgerald and Erwin dissented from the order granting review.

4. Alaska R.App.P. 24(a)(1) specifies in part:
   (a) A review is not a matter of right, but will be granted only: (1) where the order or decision sought to be reviewed is of such substance and importance as to justify deviation from the normal appellate procedure by way of appeal and to require the immediate attention of this court;
   . . . .

5. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966) requires that a person taken into custody and subjected to questioning
   . . . be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

States Constitution.[6] As a result, he urges that the items taken from him be suppressed from evidence and that the confession likewise be suppressed as the fruit of an illegal search.

██ In determining the validity of Peter's custody, the major question is whether 13 AAC 02.175(c) is impliedly repealed by AS 47.37. If this question is answered in the negative, then all other issues presented by this petition are resolved, since, with a valid arrest, the removal and the inventory of Peter's effects would be justified.[7] If, on the other hand, 13 AAC 02.175(c) is found to have been repealed by the enactment of AS 47.37, sanction for the actions of officer Sage in taking Peter into custody and searching him must be found under AS 47.37 itself, or some general police power to protect the welfare of citizens.

## THE QUESTION OF REPEAL BY IMPLICATION

Section 13 AAC 02.175(c) provides:

A person may not be upon or along a highway under the influence of an intox-

icating liquor, narcotic drug or dangerous drug, nor may a person drink intoxicating liquor while upon or along a highway.

For purposes of 13 AAC 02.175(c), a highway is defined as:

[T]he entire width between property lines of every way or place, of whatever nature when a part or all is open to the public as a matter of right for purpose of vehicular traffic. The term includes, but is not limited to, a dedicated or public subdivision street regardless of whether or not it is in the highway system and a roadside rest area, as provided by AS 41.20.050–060.[8]

Peter contends that 13 AAC 02.175(c) is impliedly repealed by the Uniform Act, AS 47.37.

The act establishes a comprehensive program for the treatment of alcoholism as a disease.[9] The specific section of AS 47.37 primarily relied on by Peter is the introductory declaration of policy wherein it is stated:

It is the policy of the state that alcoholics and intoxicated persons should

6. The United States Constitution, amendment IV, states:
   The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
   The Alaska counterpart to the above is found in the Alaska Constitution, art. I, § 14. *See* Ellison v. State, 383 P.2d 716 (Alaska 1963).

7. Avery v. State, 514 P.2d 637, 639 (Alaska 1973); United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). This is true whether the search took place at the scene of the arrest or later at the stationhouse. Lemon v. State, 514 P.2d 1151, 1158 (Alaska 1973); United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

8. 13 AAC 10.115.

9. The act, *inter alia*, sets forth a declaration of policy, establishes an office of alcoholism, an advisory board and an alcoholism program coordinator. It mandates the estab-

lishment of a comprehensive program for the treatment of alcoholics, including emergency treatment provided by a facility affiliated with a part of the medical service of a general hospital, inpatient, intermediate, outpatient and follow-up treatment. The office of alcoholism shall establish standards for and maintain a list of public and private treatment facilities. Provision is made for voluntary treatment of alcoholics.

AS 47.37.170 provides that a person who appears to be incapacitated by alcohol shall be taken into protective custody by a police officer and immediately brought to an approved public treatment facility for emergency treatment. If no such facility is readily available, he shall be taken to an emergency medical service customarily used for incapacited persons.

Provision is made for emergency commitment of an intoxicated person under specified circumstances to an approved public treatment facility for emergency treatment and for involuntary commitment to such a facility after a hearing.

The statute further provides for visitation and communication of patients, establishment of an emergency service patrol and payment for treatment.

not be criminally prosecuted for their consumption of alcoholic beverages and that they should be afforded a continuum of treatment so they may lead normal lives as productive members of society.[10]

The state begins its argument against a finding that 13 AAC 02.175(c) is impliedly repealed by referring the court to the general rule disfavoring repeals by implication.[11] Courts have established a presumption against an intent to repeal where express terms of repeal are not used.[12] Thus an earlier statute will not be impliedly repealed by a later statute where any reasonable interpretation will give effect to both.[13] However, it is clear that a statute can be repealed by implication.[14]

There are two well-settled categories of repeals by implication: (1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.[15]

There is a recent trend to limit or disregard the presumption against repeal by implication. In dealing with two laws relating to the withdrawal of land from the public domain by Indians for a settlement, the Ninth Circuit Court of Appeals stated:

As plaintiffs point out, this interpretation results in the implied repeal of the portion of section 4 of the General Allotment Act which required settlement as a precondition to application and allotment. However, the presumption against *sub silentio* repeal is a rule of interpretation based upon probable congressional intention, and, as such, has limited application here. Repeal of Indian legislation by implication is a common congressional practice.[16]

While of course distinguishable from the instant case, the above decision does indicate a move away from strict adherence to a presumption against implied repeals. Such an approach is deemed more realistic in Sutherland's treatise, Statutes and Statutory Construction.

The presumption against implied repeals is classically founded upon the doctrine that the legislature is presumed to envision the whole body of the law when it enacts new legislation, and, therefore, if a repeal of the prior law is intended, expressly to designate the offending provisions rather than to leave the repeal to arise by necessary implication from the later enactment. Still more basic, however, is the assumption

10. AS 47.37.010.

11. Federal Trade Commission v. A. P. W. Paper Co., Inc., 328 U.S. 193, 202, 66 S.Ct. 932, 936, 90 L.Ed. 1165, 1171 (1946); United States Alkali Export Ass'n v. United States, 325 U.S. 196, 209, 65 S.Ct. 1120, 1128, 89 L.Ed. 1554, 1564 (1945); Lowe v. United States Smelting, Refining and Mining Co., 175 F.2d 486, 489 (9th Cir. 1949), vacated, 338 U.S. 954, 70 S.Ct. 493, 94 L.Ed. 588 (1950); Purdy v. United States, 146 F.Supp. 762, 764, 16 Alaska 173 (D.Alaska 1956).

12. Graham v. Goodcell, 282 U.S. 409, 425, 51 S.Ct. 186, 192, 75 L.Ed. 415, 438 (1931); United States v. Rogge, 10 Alaska 130, 147 (1941), aff'd, 128 F.2d 800, 10 Alaska 307 (9th Cir. 1942), cert. denied, 317 U.S. 656, 63 S.Ct. 54, 87 L.Ed. 528 (1942).

13. City of Mesa v. Salt River Project Agr. Imp. and Power Dist., 92 Ariz. 91, 373 P.2d

722, 732 (1962), appeal dismissed, 372 U.S. 704, 83 S.Ct. 1018, 10 L.Ed.2d 124 (1963); People v. Allen, 170 Cal.App.2d 584, 339 P.2d 642, 644-645 (1959); *see* Grimes Packing Co. v. Hynes, 67 F.Supp. 43, 48, 11 Alaska 154 (D.Alaska 1946), aff'd, 165 F.2d 323, 11 Alaska 564 (9th Cir. 1947), vacated, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949).

14. Browder v. Gayle, 142 F.Supp. 707, 716 (D.Ala.1956), aff'd, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956).

15. Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351, 355 (1936), *accord*, Johnson v. City of Cincinnati, 450 F.2d 796, 797 (6th Cir. 1971); In re Estate of Lyons, 83 Wash.2d 105, 515 P.2d 1293, 1294 (1973).

16. Hopkins v. United States, 414 F.2d 464, 471 (9th Cir. 1969).

that existing statutory and common law, as well as ancient law, is representative of popular will. As traditional and customary rules, the presumption is against their alteration or repeal. The presumption has been said to have special application to important public statutes of long standing.

. . . . . . .

But the underlying theory in modern government is that it is through the legislatures and Congress that the current public demands resulting from changing social, economic and political conditions are enabled to find expression.

The presumption against implied repeal runs directly counter to the real probability, sufficient to support an assumption on which a *presumption* could justifiably be premised, that the purpose of new legislation is to change prior law, and in so doing to displace or *repeal* some of it. It is spurious and question begging to approach the decision of issues as to whether and how much a new law may have repealed provisions of earlier ones with a bias in the form of a presumption which contradicts probability.[17]

■■■ We are persuaded that in endeavoring to ascertain the legislative intent, we should not commence with a presumption against implied repeal. We shall look to the purpose indicated by the legislature in passage of an act in our effort to determine whether the new enactment is intended to repeal a prior one. If enforcement of the prior statute is in irreconcilable conflict with such purpose, it will be held to have been impliedly repealed.

In ascertaining the purpose of the legislature in enacting the Uniform Act passed in 1972, we note that the 1969 session of the Alaska Legislature presaged its enactment by passing House Concurrent Resolution No. 36 relating to the treatment of problem drinkers and alcoholics. It stated:

WHEREAS the majority of arrests in Alaska are for offenses involving the abuse of the beverage alcohol; and

WHEREAS the present "revolving door" policy of repeated arrest and incarceration has proven unsuccessful in the rehabilitation of problem drinkers and alcoholics; and

WHEREAS each unrehabilitated problem drinker or alcoholic detrimentally affects the health and quality of life of at least four additional persons; and

WHEREAS a person afflicted with a drinking problem or alcoholism can, through a comprehensive and coordinated program of treatment, be restored to health and a productive life; and

WHEREAS the continuation of problem drinkers and alcoholics in an unrehabilitated status is a costly and unnecessary waste of our "human resources";

BE IT RESOLVED that the Governor is requested to direct all appropriate agencies and facilities of the state to initiate a comprehensive and coordinated program of treatment for problem drinkers and alcoholics *to replace the present negative policy of punishment with a positive program of rehabilitation and restoration* (emphasis added).

The declaration of policy set forth in AS 47.37.010, quoted *supra,* appears to be in direct response to the 1969 resolution. While this section differs somewhat from the corresponding section of the Uniform Act [18] drafted by the National Conference of Commissioners on Uniform State Laws, the difference is not so substantial as to render the comment to the corresponding section of the Uniform Act inapplicable

---

17. 1A J. Sutherland, Statutes and Statutory Construction § 23.10 (4th ed. Sands 1972) (emphasis in original, footnotes omitted).

18. The Uniform Act provides:
    SECTION 1. [*Declaration of Policy.*] It is the policy of this State that alcoholics and intoxicated persons *may* not be subjected to criminal prosecution because of their consumption of alcoholic beverages but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society (emphasis added).

here. The comment sets out, as the purpose of this section, the following:

This section is intended to preclude the handling of drunkenness under any of a wide variety of petty criminal offense statutes, such as loitering, vagrancy, disturbing the peace, and so forth. As the crime commissions pointed out, drunkenness by itself does not constitute disorderly conduct. The normal manifestations of intoxication—staggering, lying down, sleeping on a park bench, lying unconscious in the gutter, begging, singing, etc.—will therefore be handled under the civil provisions of this Act and not under the criminal law.[19]

In enacting AS 47.37, the legislature also may be presumed to have been aware of the January 1972 report by the State Office of Alcoholism entitled Alcoholism in Alaska and the Alcoholism Grant-in-Aid Program.[20] This report indicates that, while approximately only five percent of alcoholics fit the "Skid Row" description, these account for 40 percent of all arrests, and that most of this population is handled within the criminal justice system in a manner which most authorities agree has been both ineffective and inhumane. The report recommends treatment of public intoxication as a medical-social rather than a legal-criminal problem.[21]

In discussing the benefits of the program, the report states:

More than $100 million per year is currently spent in the arrest and incarceration of the public drunkenness offender, and a large amount is also spent in health and welfare services consumed by this population. While it would be expensive to rehabilitate this population, the expense would be less than the current costs. In addition, treatment in the health system has a substantial chance of success (at least one out of four), while "treatment" in the criminal system has proven to be largely unsuccessful.[22]

The effectiveness of the program is said to depend upon the degree and effectiveness with which the judicial and law enforcement systems can collaborate with this program.[23] In that regard, the admission in oral argument that in some communities, arrests for violations of 13 AAC 02.175(c) are being utilized in lieu of the expressly repealed "drunk in public" statute, AS 11.45.032, is of some significance.

Other than the general rule of law disfavoring repeals by implication, the state advances two theories under which it urges the court to find 13 AAC 02.175(c) not impliedly repealed. Evidence of legislative intent not to repeal 13 AAC 02.175(c) is said to be found in a comparison of AS 47.37.250 with the corresponding section as it appears in the Uniform Act. The corresponding section of the Uniform Act which is § 19 entitled "Criminal Laws Limitations", states:

(a) No county, municipality, or other political subdivision may adopt or enforce a local law, ordinance, resolution, or rule having the force of law that includes drinking, being a common drunkard, or being found in an intoxicated condition as one of the elements of the offense giving rise to a criminal or civil penalty or sanction.

(b) No county, municipality, or other political subdivision may interpret or apply any law of general application to circumvent the provision of subsection (a).

(c) Nothing in this Act affects any law, ordinance, resolution, or rule against drunken driving, driving under the influence of alcohol, or other similar of-

19. Uniform Act, § 1, Comment.

20. AS 47.30.470(7) requires the Department of Health and Social Services to submit an annual report concerning alcoholism in Alaska and the grant-in-aid program within ten days after the convening of the legislature in each regular session.

21. Office of Alcoholism, Alaska Dep't of Health and Social Services, Alcoholism in Alaska and the Alcoholism Grant-in-Aid Program 9 (1972).

22. Id. at 10.

23. Id.

fense involving the operation of a vehicle, aircraft, boat, machinery, or other equipment, or regarding the sale, purchase, dispensing, possessing, or use of alcoholic beverages at stated times and places or by a particular class of persons.

The state finds the omission of sections (a) and (b) of the Uniform Act from the Alaska version of that act to be evidence of legislative intent to preserve a number of local laws and ordinances relating to drunkenness.[24] Defendant Peter agrees with this although he suggests that the local laws and ordinances intended to be preserved through this omission are those existing in Alaska's "dry" communities as well as rules pertaining to hours of operation of beverage dispensaries, and other matters unrelated to criminal sanctions for public drunkenness.[25] On this point, it seems Peter's interpretation is the more reasonable. Should the state's argument be accepted, there would seem to be no limit to the laws which might be passed to circumvent the purpose of the Uniform Act as adopted by Alaska.

Citing from the text of AS 47.37, the state also argues that the legislature expressly allowed for the continued validity of regulations like 13 AAC 02.175(c). Specifically, the state refers to AS 47.37.250 which provides in part:

> (a) Nothing in this chapter affects a statute, ordinance, or regulation relating to (1) drunken driving, driving under the influence of alcohol, or other similar offenses involving alcohol and the operation of a vehicle, aircraft, boat, machinery, or other equipment, or (2) the sale, purchase, dispensation, possession, or use of alcoholic beverages at specified times and places or by a particular class of persons.

As an alternative line of reasoning by which the continued validity of 13 AAC 02.175(c) may be upheld, the state argues that the portion of the statute making it nonapplicable to drunken driving and similar offenses or to "the sale, purchase, dispensation, possession or use of alcoholic beverages at specified times and places or by a particular class of persons" shows an intention to preserve the regulation which in part relates to use of an intoxicating liquor along a specified place (a highway) by a particular class of persons (pedestrians). This section, however, refers only to the sale, purchase, dispensation or use of alcoholic beverages, not to being intoxicated at "specific times and places" as the state is candid enough to admit in its brief filed herein. A construction as suggested by the state to expand the nonapplicability section to include anyone intoxicated on a highway would have the effect of emasculating the statute.

■■■■■ Given the expansive definition of the word "highway" as it appears in 13 AAC 02.175(c) (the entire width between property lines), it is hard to imagine how a person could appear in public in an intoxicated condition without sooner or later violating 13 AAC 02.175(c). Since a highway as defined by 13 AAC 10.115 includes not only highways but public subdivision streets adjacent to which most homes are located, a person walking from his home in an intoxicated condition would almost immediately be in violation of 13 AAC 02.175(c). Similarly, establishments serving liquor are almost without exception located adjacent to a highway as defined by 13 AAC 10.115. Thus, once again, a person leaving such an establishment in an intoxicated condition would almost certainly be subject to arrest for violation of 13 AAC 02.175(c). In short, for all practical

---

**24.** Under its own theory, 13 AAC 02.175(c) is excluded in that it is a regulation of statewide applicability and not a local ordinance.

**25.** AS 04.10.430 provides for local option elections to prohibit the licensing of beverage dis-

pensaries. AS 04.15.010 authorizes municipalities to provide for additional closing hours, and AS 04.15.020 permits municipalities to determine whether sales may be permitted on election day.

purposes, 13 AAC 02.175(c) is little more than a law prohibiting public drunkenness in the guise of a traffic regulation. This is not to make light of the state's justifiable interest in protecting the drunk from stumbling off the sidewalk into the path of an automobile and in protecting the driver from injury resulting from any attempt to avoid such an individual. However, it seems the legislature has previously found this interest to be subordinate to the desire to provide some treatment other than a jail cell for those addicted to alcohol, the ones most likely to violate any law prohibiting public drunkenness. As pointed out by defendant Peter, the legislature, concurrent with the enactment of the Uniform Act, provided for the repeal of AS 11.45.032,[26] Alaska's public drunkenness statute, which states in part:

> (a) A person who (1) is drunk in a private place, not his own property or his usual place of abode, or in a public place, to the annoyance of another, or (2) *drinks intoxicating liquor on a public street or sidewalk,* or on the premises of a public carrier or business establishment offering goods or services to the public, which is not licensed to dispense intoxicating liquor, upon conviction, is guilty of a misdemeanor, and is punishable by a fine of not more than $300, or by imprisonment for not more than 30 days, or by both.

Initially, it is worthy of note that the emphasized portion of AS 11.45.032(a), now repealed, punished behavior identical to that which will continue to be punished under 13 AAC 02.175(c) if the latter regulation is found to remain in effect.[27] Moreover, by providing criminal sanctions for being drunk in a public place, AS 11.45.032 certainly prohibited being drunk on public streets and highways. In enacting AS 47.37 and repealing AS 11.45.032, the legislature no doubt considered the effect of eliminating the power to arrest the person found staggering down the street in an intoxicated condition, and evidenced an intent that treatment of alcoholism as a disease should be more important than punishing the symptoms. We hold that there is an irreconcilable conflict between an act, a principal purpose of which is to decriminalize public drunkenness, and a regulation making it a misdemeanor to appear upon or along a highway or street in an intoxicated condition. The Uniform Act is a response to changing attitudes towards those in our society who are unable to deal with alcohol responsibly. It incorporates into the law the realization that alcoholism is a disease, and that symptoms of this disease, i. e., public drunkenness, should not be made the subject of criminal sanctions. Rather, the legislature has decided that the proper reaction is to treat these manifestations of the disease of alcoholism through a comprehensive care program. To the extent that prior laws would defeat this purpose, they must fall.[28]

## THE SEARCH QUESTION

Our holding that AS 47.37 impliedly repealed 13 AAC 02.175(c) eliminates the argument that the items taken from Peter were the result of a search incident to a valid arrest.[29] But we still are confronted with the question of whether officer Sage improperly obtained knowledge that Peter was in possession of goods stolen from the Kaleaks. The limited record before us

---

**26.** Ch. 207, § 2 [1972] SLA (emphasis added).

**27.** Among other things, 13 AAC 02.175(c) prohibits the drinking of intoxicating liquor while upon or along a highway.

**28.** The act, of course, does not make drunkenness a defense to criminal liability for non-alcoholic substantive offenses committed by one under the influence of liquor.

**29.** *See* McCoy v. State, 491 P.2d 127 (Alaska 1971). Moreover, Peter contends that because Sage did not intend to press charges, the arrest should not be made the basis for a search. Since we have held that there was no valid arrest, this argument is no longer relevant, but we note that in the absence of a pretext arrest for the purpose of making a search, the question of whether or not it is administratively decided to press charges would have no bearing on the validity of a search incident to the arrest. No issue of a pretextual arrest has been raised by this petition.

does not disclose a list of the items reported to Sage as being stolen. It does indicate that Nimrod Bodfish turned over to the officer a camera case and some .22 caliber ammunition he had seen Peter drop. Also, when Sage confronted Peter, he dropped a box of .22 caliber shells. Thus the shells and camera case did not come to his attention as the result of a search. Sage also discovered camera film and some bottles of shaving lotion while making a routine search before placing Peter in the vehicle. Although under our holding, Sage had no right to arrest Peter for being drunk on the highway, he may have had a duty to take him into protective custody and to bring him to an approved public treatment facility in the event that Peter was incapacitated.[30] We take judicial notice that Barrow had no such approved facility at the time of Peter's arrest. In that event, the statute provides that the incapacitated person be taken to an emergency medical service customarily used for incapacitated persons. We also take judicial notice that

Barrow has a hospital to which incapacitated persons are customarily taken.[31]

Under AS 47.37.170, a peace officer in detaining the person and in taking him to an approved public treatment facility, is taking him into custody and "may take reasonable steps to protect himself". While a statute countenancing an unreasonable search would be in violation of the fourth amendment to the United States Constitution and the similar article I, section 14 of the Alaska Constitution,[32] the provisions of AS 47.37.170 constitute no such violation. An officer transporting a person incapacitated by drink has a valid reason to make a limited search for possible weapons which might be used to injure him. Accordingly, any items discovered by Sage as a result of such a search made prior to transporting Peter to jail were not the product of an illegal search.[33]

There is difficulty, however, with any additional items obtained at the time of the more detailed search performed when

---

30. AS 47.37.170(b) specifies:

(b) A person who appears to be incapacitated by alcohol shall be taken into protective custody by a peace officer or a member of the emergency service patrol and immediately brought to an approved public treatment facility for emergency treatment. If no approved public treatment facility is readily available he shall be taken to an emergency medical service customarily used for incapacitated persons. The peace officer or a member of the emergency service patrol, in detaining the person and in taking him to an approved public treatment facility, is taking him into protective custody and he shall make every reasonable effort to protect his health and safety. In taking the person into protective custody, the detaining officer may take reasonable steps to protect himself. Protective custody does not constitute an arrest under this section and no entry or other record shall be made to indicate that the person has been arrested or charged with a crime.

In AS 47.37.270(8), the condition of being incapacitated by alcohol is described as follows:

'incapacitated by alcohol' means a person who is unconscious or has his judgment otherwise so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment, as evidenced objectively by extreme physical debilitation, physical harm or threats of harm to others or chronic inability to hold regular employment; . . . .

31. We do not know whether at the time in question the hospital admitted intoxicated persons. In any event, however, the state was required by the act to provide for an approved public treatment facility or secure an emergency service, and, unless designated as a public treatment facility, the jail would not qualify as such a facility or service. Since the issue is not presented, we do not pass on the question of whether a jail may validly be designated as a public treatment facility.

32. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 392, 91 S.Ct. 1999, 2002, 29 L.Ed.2d 619, 624 (1971); Sibron v. New York, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917, 934 (1968); Cooper v. Calif., 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed. 2d 730, 733 (1967).

33. We make no determination at this point as to whether Peter, when discovered by officer Sage, was incapacitated or merely intoxicated. (AS 47.37.270(10) defines an intoxicated person as one whose mental or physical functioning is substantially impaired as a result of the use of alcohol.)

Peter was placed in jail. Under the Uniform Act, he should have been taken to a treatment facility or an emergency medical service. At that point the police would normally release him from custody, and thus would have direct access to items in the possession of the intoxicated person. Accordingly, any items that were revealed or came into the possession of officer Sage solely as a result of this latter search were the subject of an illegal search and seizure and should be suppressed.

We are left with a number of unresolved factual questions.

1. Did officer Sage have probable cause to believe that Peter was incapacitated by alcohol? Only if this were the case was Sage authorized to take Peter into protective custody.

2. What were the items reported to Sage as being stolen from the Kaleaks?

3. Assuming that there was probable cause to believe that Peter was incapacitated, would the officer have questioned Peter about the burglary based solely on the items which Sage had properly discovered on taking Peter into protective custody and prior thereto, without in any manner considering any additional items discovered as a result of the illegal search at the jail?

4. Assuming that there was not probable cause to believe that Peter was incapacitated, would the officer have questioned Peter about the burglary based solely on the items revealed to Sage from sources other than the searches?

 In Wong Sun v. United States,[34] it was held that evidence obtained as the "fruit" of an officer's unlawful action was inadmissible in evidence. Thus, if Peter's confession was the "fruit" of an illegal search or searches, it is inadmissible in evidence. But if it was obtained as a result of lawfully acquired information, and not in any manner in reliance on illegally acquired information, it is admissible.

Prior to *Wong Sun*, Justice Holmes succinctly stated the underlying principle in Silverthorne Lumber Co. v. United States[35] as follows:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

We therefore remand the case for resolution of the factual issues discussed in this opinion and such further proceedings as may be necessary.

Remanded.

34. 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

35. 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920).