## PROGRESSIVE INSURANCE CO., Appellant,

v.

## Marie SIMMONS as Mother of Teisha Simmons and State of Alaska, Division of Medical Assistance, Appellees.

### No. S–7617.

Supreme Court of Alaska.

Feb. 20, 1998.

**512**

Gregory G. Silvey, Guess & Rudd, Anchorage, for Appellant.

Michael W. Flanigan, Walther & Flanigan, Anchorage, and Allen R. Cheek, Law Office of Allen R. Cheek, Fairbanks, for Appellees.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE, and BRYNER, JJ.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

■ In this appeal, we must decide whether recent statutory amendments expanding the scope of underinsured motorist coverage also impliedly repealed a facially unaltered statutory definition of "underinsured motor vehicle," which narrowly restricts the circumstances triggering underinsured motorist coverage. We conclude that implied repeal must be found.

### II. FACTS AND PROCEEDINGS

The parties do not dispute the relevant facts. Fifteen-year-old Teisha Simmons suffered serious injuries in a single-car accident near Galena in 1992; Simmons was a passenger at the time. The car's driver was insured under an automobile insurance policy with Progressive Northwestern Insurance Company (Progressive). The policy provided liability coverage for bodily injury in the amounts of $50,000 per person and $100,000 per accident, as well as uninsured motorists (UM)/underinsured motorists (UIM) protection in like amounts. For purposes of the policy's UIM coverage, Simmons was deemed to be an insured person.

Simmons's bodily injuries resulted in damages totaling more than $100,000. Through her mother, Simmons sought separate payments of policy limits from Progressive under both the liability and UIM policies.[1] Progressive tendered payment of policy limits under the liability portion of the policy but denied Simmons's UIM benefits claim. Simmons and Progressive agreed to a partial settlement, pursuant to which Simmons accepted policy limits under the liability coverage, while reserving the right to litigate her UIM claim through a superior court action.

The parties eventually filed cross-motions for summary judgment on the UIM claim. Superior Court Judge John Reese granted Simmons's motion, finding that Simmons was entitled to recover UIM payments in addition to the liability payments she had already received. The court entered judgment against Progressive for the full single-person limit of the UIM policy.

Progressive appeals the superior court's determination that Simmons is entitled to UIM benefits.

### III. DISCUSSION

#### A. Standard of Review

This appeal involves questions of statutory construction, which we resolve *de novo* by applying our independent judgment. *See Deal v. Kearney,* 851 P.2d 1353, 1356 n. 4 (Alaska 1993). In so doing, we have a "duty ... to adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

#### B. Did Simmons's Accident Involve an "Underinsured Motor Vehicle" as that Term Was Defined in Former AS 28.20.445(h)?

Progressive asserts that the car Simmons was riding in when she was injured was not underinsured. Progressive further asserts that involvement of an underinsured motor vehicle is necessary to trigger UIM coverage.

---

1. Separate claims were also asserted by Simmons's mother, another injured passenger, and the Alaska Division of Medical Assistance; all of these claims were eventually resolved.

Accordingly, in Progressive's view, Simmons had no right to UIM payments.[2]

Under AS 21.89.020(c), insurance companies writing automobile liability policies in Alaska must offer coverage for damages caused by drivers of "uninsured or underinsured motor vehicles." Here, as we have already indicated, it is undisputed that Simmons was an "insured person" under a Progressive policy providing liability and UIM coverage with $50,000/$100,000 per person/per accident limits.

To determine whether the car was an "underinsured motor vehicle," we turn to former AS 28.20.445(h), which was in effect at the time of Simmons's accident. This subsection defined the term to mean a car with liability coverage for bodily injury in an amount that

(1) is less than the limit for ... underinsured motorists coverage under the insured's policy; or

(2) has been reduced by payments to persons other than an insured, injured in an accident, to less than the limit for ... underinsured motorists coverage under the insured's policy.[3]

Under this definition, Simmons's accident did not involve an underinsured motor vehicle: subparagraph (1) does not apply to Simmons, since the limits of Progressive's liability coverage were equal to, not "less than," those of its UIM coverage; subparagraph (2) likewise does not apply, since the only payment reducing the liability coverage available

to Simmons was the payment to Simmons herself—an insured person under the policy rather than a "person[ ] other than an insured." If this definition governed Simmons's case, Simmons would not have suffered damages caused by the driver of an underinsured motor vehicle; hence, her right to UIM benefits would never have been triggered.

**C.** *Did the 1990 Revision of the Uninsured and Underinsured Motorists Statute, AS 28.20.445(a) and (b), Impliedly Repeal the Definition of "Underinsured Motor Vehicle" in AS 28.20.445(h)?*

While Simmons does not dispute that the car she was riding in would fail to qualify as an "[u]nderinsured motor vehicle" within the meaning of AS 28.20.445(h), she nonetheless insists that she was entitled to UIM coverage. Specifically, Simmons contends that changes to the UIM statute enacted by the Alaska Legislature in 1990 impliedly repealed subsection (h)'s definition of underinsured motor vehicle.

*1. Background of statutory changes*

Before we address the particulars of Simmons's implied repeal argument and Progressive's response, it is appropriate to describe briefly the 1990 amendments and the law governing UIM coverage prior to their enactment.

---

**2.** As Progressive puts it: "A straightforward reading of both the policy and the relevant statutes demonstrates that there was no underinsured motor vehicle here, and consequently no underinsured motorist benefits are available to Teisha Simmons for this accident."

**3.** The definition set forth in former subsection (h) applied to the provisions of AS 22.20.445, which deal specifically with uninsured and underinsured motorists coverage. An almost identical definition of "underinsured motor vehicle" was included in former AS 28.40.100(a)(22), the general definitional provision for Alaska's Uniform Vehicle Code, Alaska Statutes, Title 28.

The Alaska legislature recently repealed AS 28.20.445(h) and amended AS 28.40.100(a)(22). *See* Ch. 81, § 114–15, SLA 1997, effective July 1, 1997. The amended version of AS 28.40.100(a)(22) provides that an underinsured motor vehicle is one

for which there is a bodily injury or property damage insurance policy or a bond applicable at the time of an accident and the amount of insurance or bond is less than the amount the covered person is legally entitled to recover for bodily injury or property damage from the owner or operator of the underinsured motor vehicle.

This repeal and amendment address the statutory conflict that we discuss in this opinion, *see infra* Part III.C.4. The apparent effect of this recent legislative action is that people similarly situated to Simmons are viewed as traveling in underinsured motor vehicles, and are thus permitted to "stack" insurance recoveries under the provisions of AS 28.20.445(a) and (b). *See infra* Part III.C.1. To avoid awkwardness, in this opinion we generally refer to "AS 28.20.445(h)" and "subsection (h)" rather than to "former AS 28.20.445(h)" and "former subsection (h)."

Alaska law formerly took a narrow approach to the compensation of those injured by underinsured motorists by adopting a "reduction" scheme of UIM coverage. As originally adopted in 1984, AS 28.20.445(a) and (b) fixed the maximum amount of an insurer's liability on any given UIM policy by subtracting from the UIM policy limits any amount paid or payable to the insured from other sources, including liability coverage.[4] By subtracting from UIM policy limits all other payments, these provisions rendered UIM coverage superfluous to the extent of coverage under any liability policy. This narrow reduction approach thus precluded an injured person from combining, or "stacking," liability and UIM coverages, even when neither coverage alone would fully pay the person's damages.

In 1990, the Alaska Legislature considered CSHB 429, a proposal to broaden UIM coverage by substituting an "excess" approach for the original reduction approach. This broader approach sought to compensate the injured person for actual damages sustained in an accident. Accordingly, CSHB 429 expressly allowed UIM payments to supplement, or be "excess to," available liability coverage to the extent of actual damages or combined policy limits, whichever was less.

Representative Dave Donley, chief sponsor of the bill, addressed the House Judiciary Standing Committee concerning the purpose of this legislation:

> [T]he bill is aimed at underinsured or uninsured automobile insurance. The consumer thinks they are buying a certain amount of insurance coverage, for example $100,000. In fact, what they are buying is protection up to $100,000. If they were hit by someone with $25,000 insurance, their own insurance company would only pay $75,000. Most people don't realize this

when they purchase insurance. [The bill] is an attempt to better compensate consumers for their actual damages.

Minutes, House Judiciary Standing Committee, March 20, 1990, at 13. Donley further explained that, whereas the insurance statutes generally prevented stacking of multiple insurance policies to obtain multiple recoveries, his proposed amendment "creates an exception to this antistacking rule."

Elaborating on Representative Donley's statements, Don Koch, Acting Deputy Director of Alaska's Division of Insurance, told the committee that he had helped draft CSHB 429 and that the bill was intended to "solve the problem mentioned by Representative Donley by making the coverage in excess of the policy not diminished by what coverage the responsible party might have." *Id.* at 14. Koch later went on to explain that the amendments

> would assure that if an individual bought $100,000 of uninsured or underinsured motorist protection, and the other party has $200,000 coverage available, the first individual's $100,000 coverage would come in after the $200,000 is utilized.

*Id.* at 15.

Similarly, Representative Donley told the Senate Labor and Commerce Committee that

> it became apparent that people weren't getting what they thought they were when buying uninsured/underinsured motorist coverage. Currently, if an individual buys a standard policy with $100,000 worth of uninsured/ underinsured coverage and is in an accident and the person who hits him has $50,000 worth of insurance, that individual's policy only covers him for the difference between the $50,000 and the $100,-

---

4. AS 28.20.445(a) and (b) formerly provided:

(a) The maximum liability of the insurance carrier under the uninsured and underinsured motorists coverage required to be offered under AS 28.20.440 shall be the difference between the coverage limit of liability and the amount paid to the insured by or on behalf of the uninsured and underinsured motorist.

(b) Amounts payable under the uninsured motorists and underinsured coverage may be reduced by

(1) amounts paid or to be paid under any worker's compensation law;
(2) amounts paid or payable under valid and collectible automobile medical payments insurance or bodily injury or death liability insurance; and
(3) amounts paid by or on behalf of the uninsured or underinsured motorist.

Ch. 70, § 12, SLA 1984.

000. Most consumers believe that they are buying an additional $100,000 in protection, but they are not.

Minutes, Senate Labor and Commerce Committee, May 2, 1990, at 13.

The legislature ultimately passed CSHB 429; as amended by that bill, subsections (a) and (b) of AS 28.20.445 now provide:

(a) The maximum liability of the insurance carrier under the uninsured and underinsured motorists coverage required to be offered under AS 28.20.440 shall be the lesser of

(1) the difference between the amount of the covered person's damages for bodily injury and property damage and the amount paid to the covered person by or for a person who is or may be held legally liable for the damages; and

(2) the applicable limit of liability of the uninsured and underinsured motorist coverage.

(b) An amount payable under the uninsured and underinsured motorist coverage shall be excess to an amount payable under automobile bodily injury, death, or medical payments coverage, or as workers' compensation benefits and may not duplicate amounts paid or payable under valid and collectible automobile bodily injury, death, or medical payments coverage, or as workers' compensation benefits.

At the same time it amended subsections (a) and (b) of the UIM statute, however, the legislature left intact the previously quoted definition of "underinsured motor vehicle," at the time set out in subsection (h) of the same statute.[5] By narrowly describing the circumstances under which UIM coverage is triggered, this definition substantially reduced the number of cases in which UIM coverage could supplement liability payments.

### 2. The parties' implied repeal arguments
#### a. Simmons's argument

Pointing to the restrictive effect of subsection (h) on the expanded form of UIM coverage adopted in 1990, Simmons argues that this subsection is in obvious conflict with the amended versions of subsections (a) and (b) and must therefore be deemed impliedly repealed.

Simmons maintains that the legislature's intent in enacting the 1990 amendments was obvious: first, to permit stacking of UIM and liability coverages to the extent necessary for full compensation of actual damages; second, to preclude the offset of UIM coverage by liability payments against UIM coverage except when necessary to prevent double recovery. Simmons reasons that the narrow triggering mechanism in AS 28.20.445(h) is thus inconsistent with this legislative purpose, because its effect is to reduce UIM coverage. Surmising that "the legislature apparently did not consider [AS 28.20.445(h)] when writing its amendments," Simmons urges that this

oversight should not be elevated to a "veto" of the 1990 amendments when the explicit language which was removed and inserted, along with the clear legislative intent, makes the legislature's changes to allow stacking of UIM coverage on top of liability coverage to the extent of a claimant's damages, abundantly clear.

#### b. Progressive's reply

Progressive insists that Simmons's implied repeal argument—which the superior court accepted in granting summary judgment—lacks merit.

Progressive reads the 1990 amendments to AS 28.20.445(a) and (b) as having left intact subsection (h)'s definition of "underinsured motor vehicle," and as having simply altered the allowable benefits that are payable once UIM coverage is triggered. The precise effect of the changes, according to Progressive, is that "*if* the insured's injuries are found to have been caused by an underinsured motor vehicle, as that term is defined in the stat-

---

**5.** The legislature similarly left unaltered AS 28.22.211, a UIM provision of the Alaska Mandatory Automobile Insurance Act mirroring the reduction approach enacted in the original version of AS 28.20.445, a provision of the Motor Vehicle Safety Responsibility Act. The legislature has re-cently repealed AS 28.22.211. *See* Ch. 81, § 115, SLA 1997. The repeal of this provision was part of the same act that repealed AS 28.20.445(h) and amended AS 28.40.100(a)(22). *See supra* note 3.

utes, he or she may recover up to the maximum of the underinsured motorist benefits that [the insured's] policy provides," without that sum being offset by what has been paid by the underinsured motorist.

More particularly, Progressive argues:

The 1990 amendments will still provide additional UIM benefits if the definition of underinsured motor vehicle is left intact.... Insureds will receive greater UIM protection, as the legislature intended, with the current definition of underinsured motor vehicle left in place. It will be necessary to determine at the outset whether UIM coverage is triggered, but if it is, the insured will receive up to the total UIM limit, without offset for amounts paid under the tortfeasor's liability coverage.

### 3. *Principles governing implied repeal*

The principle of repeal by implication is one of pragmatic realism:

The legislatures cannot be expected to have complete knowledge of the detail contained in the statute laws of a state, nor have they the time to extensively research the mass of statutory provisions in order to specify what statutes should be repealed. In the course of enacting legislation, it is only natural that subsequent enactments could declare an intent to repeal preexisting laws without mention or reference to such laws. A repeal may arise by necessary implication from the enactment of a subsequent act.

1A Norman J. Singer, *Sutherland Statutory Construction* § 23.09, at 337 (5th ed.1994) (footnotes omitted).

■ In determining whether one legislative enactment impliedly repeals another, "[l]egislative intent is the key." *Hafling v. Inlandboatmen's Union of the Pac.*, 585 P.2d 870, 876 n. 20 (Alaska 1978).

It is the necessary effect of the later enactment construed in the light of the existing law that ultimately determines an implied repeal. As the legislative intent defines the operation of the statute and divulges the purpose and limitations of the enactment, it may establish or deny a repeal by implication. Therefore in the process of construing a statute the intent of the legislature is always of prime importance.

Singer, *supra*, § 23.09, at 338.

■ Although a presumption against implied repeal has often been applied elsewhere, *see generally id.*, § 23.10, Alaska has recognized that this presumption is artificial and potentially at odds with the primacy of legislative intent; accordingly, our cases have expressly declined to invoke the presumption:

We are persuaded that in endeavoring to ascertain the legislative intent, we should not commence with a presumption against implied repeal. We shall look to the purpose indicated by the legislature in passage of an act in our effort to determine whether the new enactment is intended to repeal a prior one. If enforcement of the prior statute is in irreconcilable conflict with such purpose, it will be held to have been impliedly repealed.

*Peter v. State*, 531 P.2d 1263, 1268 (Alaska 1975).

■ To determine whether two statutory provisions stand in conflict, we must interpret them together, in context with other pertinent provisions rather than in isolation, and with a view toward reconciling conflict and producing "a harmonious whole." *City of Anchorage v. Scavenius*, 539 P.2d 1169, 1174 (Alaska 1975) (quoting 2 J. Sutherland, *Statutes and Statutory Construction*, § 4703, at 336–37 (Horrack ed., 3d ed.1943)).

When construing statutory provisions for the presence or absence of conflict, we do not mechanically adhere to their literal meaning in disregard of legislative intent. *See Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991). Instead of the "plain meaning" rule, Alaska follows a sliding scale approach best summed up as, "the plainer the meaning of the language of the statute, the more convincing any contrary legislative history must be." *Id.* (citing *State v. Alex*, 646 P.2d 203, 208–09 n. 4 (Alaska 1982)). This approach calls for application of the rules of statutory construction and inquiry into legislative history, even when statutory language appears clear in the abstract. *See Homer*

*Elec. Ass'n v. Towsley,* 841 P.2d 1042, 1043–44 (Alaska 1992).

■ Neither literal clarity of statutory language nor the desire to avoid implied repeal can justify construing a statute in a manner that is plainly unreasonable in light of its intent, "because giving the statute an unintended meaning 'would be stepping over the line of interpretation and engaging in legislation.'" *State v. Alex,* 646 P.2d 203, 207–08 (Alaska 1982) (quoting *Gottschalk v. State,* 575 P.2d 289, 296 (Alaska 1978)). The goal of reconciling conflict must thus give way when harmony between potentially conflicting provisions can be achieved only at the price of an interpretation at odds with statutory purpose. *See Peter,* 531 P.2d at 1268; *cf. Alex,* 646 P.2d at 207–08.

4. *Does subsection (h) irreconcilably conflict with the purpose of the 1990 amendments to subsections (a) and (b)?*

Comparing the pre- and post-amendment versions of AS 28.20.445 leaves little doubt that the 1990 amendments marked a basic change in the UIM provision. Despite widespread differences in language and detail from state to state, two basic statutory approaches for providing UIM coverage have emerged nationwide, each reflecting a fundamentally different coverage philosophy and employing an essentially distinct coverage mechanism.

The first approach—reduction coverage—strives to provide a predictable level of compensation by essentially allowing the purchaser of UIM insurance to choose in advance the limits of coverage that will apply in the event of future injuries inflicted by a negligent motorist. *See* 3 Irvin E. Schermer, *Automobile Liability Insurance 3d* § 57.01 (1995). This approach guarantees compensation in the amount selected for UIM coverage, but no more. In contrast, the second approach—excess coverage—seeks to maximize the potential for full compensation by allowing the purchaser of UIM insurance to supplement available liability payments with UIM payments to the extent necessary to cover all actual damages. *See State Auto. Mut. Ins. Co. v. Youler,* 183 W.Va. 556, 396 S.E.2d 737, 747 (1990)[6]; *see also* Schermer, *supra,* § 56.02, § 57.01[2] (citing AS 28.20.445(b) as a "full compensation" statute).

These divergent approaches necessarily translate into differing notions of what constitutes an underinsured motorist and an underinsured motor vehicle. Under a reduction coverage scheme, an underinsured driver is one whose liability limits are less than the UIM limits covering the injured person, or whose liability coverage becomes unavailable to the injured person. Under an excess coverage provision, an underinsured driver is one whose liability limits are insufficient to cover the injured person's actual damages. As Schermer puts it:

In some states the tortfeasor's vehicle is deemed underinsured when its bodily inju-

6. In *Youler,* the Supreme Court of West Virginia provided a particularly helpful description of these two approaches:

One approach ... is that the tortfeasor's liability insurance coverage is to be set off against the underinsured motorist coverage limits. This type of underinsured motorist legislation, sometimes called reduction-type or decreasing-layer underinsured motorist coverage, is premised upon the idea that the purpose of underinsured motorist coverage is to put the insured in the same position he or she would have occupied had the tortfeasor's liability insurance limits been the same as the underinsured motorist coverage limits purchased by the insured. Part of this level of coverage is provided in effect by the tortfeasor's liability insurance, and the remainder is provided by the underinsured motorist coverage.

The second approach ... is that the tortfeasor's liability insurance coverage is to be set off against the amount of *damages* sustained by the injured person, and the insurer providing the underinsured motorist coverage is liable to such injured person ... for any excess, up to the limits of the underinsured motorist coverage. This type of underinsured motorist legislation, sometimes called excess-type or floating-layer underinsured motorist coverage, is premised upon the idea that the injured person is entitled to recover under his or her own underinsured motorist coverage to the extent that the tortfeasor's liability insurance coverage is insufficient to compensate the injured person fully for his or her loss, subject only to the limits of the underinsured motorist coverage.

*Youler,* 396 S.E.2d at 747–48 (citations and footnotes omitted).

ry liability limits are less than the insured's [underinsured] motorist limits.... In some states the tortfeasor's vehicle is deemed underinsured when its bodily injury limits are inadequate to compensate the insured for his damages.

Schermer, *supra,* § 56.02, at 56–6.

As should be clear from our summary of our own state's statutory background, Alaska initially opted for the first approach to UIM coverage—reduction coverage—but in 1990, the legislature changed to the second—excess coverage. Yet notwithstanding this philosophical shift, the definition of "underinsured motor vehicle" set out in AS 28.20.445(h) continued to be the one originally tailored to suit reduction coverage. The misfit is apparent and has serious adverse consequences.

In the context of Alaska's current provision allowing excess UIM coverage, subsection (h) serves no rational purpose; its sole effect is to allow or deny excess UIM coverage on an arbitrary basis. A purchaser of automobile insurance has no way to predict the liability coverage limits of another motorist whose negligent acts might some day cause the purchaser injury. As a result, when subsection (h) is applied in the context of an excess coverage statute, the purchaser has no way to predict whether excess coverage will be triggered in an accident where liability coverage proves inadequate for full compensation. The triggering of excess coverage becomes a game of chance: if an injured person happens to have chosen a level of UIM coverage even a dollar higher than

the liability limits of the motor vehicle causing the injuries, excess UIM compensation is triggered as necessary for full compensation, up to the selected UIM limit; yet if the liability limits of the injuring vehicle increase by only a dollar—becoming equal to the injured person's UIM coverage—the injured person receives no UIM benefits at all.[7]

Progressive altogether fails to explain how this particular definition can be deemed rational in the context of Alaska's current excess coverage approach to UIM insurance. Beyond positing the need for *some* definition of "underinsured motor vehicle" to trigger UIM coverage, Progressive offers no justification for subsection (h). Nor can we conceive of any rational explanation for the provision.[8] The close fit between this provision and Alaska's former reduction coverage statute and the provision's seeming senselessness in the context of the 1990 amendments provide telling evidence that its continued existence was not contemplated in 1990.

Progressive nonetheless argues that subsection (h) is logically compatible with the purpose of the 1990 amendments and that the provision must therefore stand. According to Progressive, the legislature's goal in adopting the 1990 amendments was to increase UIM coverage by allowing excess compensation in some cases. Progressive asserts that, even with the narrow triggering definition in subsection (h), the amended version of AS 28.20.445 affords broader coverage than its predecessor because it does sometimes result in excess coverage. Progressive thus reasons that implied repeal is not neces-

---

7. The situation is even worse for persons who choose UIM coverage equal to the statutory minimum for liability coverage, for in their case the coverage will be all but illusory—that is, if the injuring vehicle is insured at all, its limit of liability coverage will by definition equal or exceed the injured person's limit of UIM coverage, the sole exceptions being accidents involving multiple injuries where available liability payments are depleted and accidents involving motor vehicles covered by policies from states with minimum liability limits lower than Alaska's. *Cf. Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 383 (Tex.1989) (stating that, in minimum limits cases, "the underinsured motorist coverage for which the policyholder has paid a premium would be worthless unless there were multiple claimants with substantial damages").

8. We disagree with Progressive's argument that there is a need for some definition of "underinsured motor vehicle." Implicit in subsection .445(a) is the concept that an underinsured motor vehicle is a vehicle with liability coverage that is insufficient to pay the covered person's damages. *See* Schermer, *supra,* § #56.02, at 56–6 ("[In excess coverage states] the tortfeasor's vehicle is deemed underinsured when its bodily injury limits are inadequate to compensate the insured for his damages"). We note again that the legislature, when it recently repealed AS 28.20.445(h), also amended AS 28.40.100(a)(22), which defines "underinsured motor vehicle" for Title 28, the Alaska Uniform Vehicle Code. *See supra* note 3. The amended definition is consistent with the excess coverage approach of AS 28.20.445(a) and (b).

sary to fulfill the legislature's goal of increased coverage.

But in our view, Progressive seriously underestimates the strength and specificity of legislative history bearing on the statutory purpose of the 1990 amendments. Representative Donley's remarks in legislative committee hearings, quoted above, strongly suggest that he envisioned CSHB 429, with its focus on full compensation for actual damages, as a general substitute for, not just an occasional relaxation of, the then-existing approach to reduction-based coverage.

As also shown above, the legislative testimony of the Insurance Division's Acting Deputy Director, Don Koch, confirmed Donley's remarks. Koch indicated that excess UIM coverage would "not [be] diminished by what coverage the responsible party might have." Minutes, House Judiciary Standing Committee, March 20, 1990, at 14. The example Koch used to illustrate this point unmistakably demonstrated his view that, under the proposed amendments, excess UIM coverage would be triggered even if liability limits exceeded UIM coverage:

> [I]f an individual bought $100,000 of uninsured or underinsured motorist protection, and the other party has $200,000 coverage available, the first individual's $100,000 coverage would come in after the $200,000 is utilized.

*Id.* at 15.

Moreover, the argument that subsection (h) is consistent with the 1990 amendments becomes colorable only if Progressive is correct in characterizing greater UIM coverage as the sole purpose underlying the amendments. Progressive's view of the amendments' purpose is unduly constricted, however, for it ignores another vital goal of the 1990 legislation—upholding consumer expectations.

The passages of legislative history we have quoted establish beyond doubt that uphold-ing consumer expectations—always an important factor in the interpretation of insurance policies and statutes[9]—was a matter of crucial concern to the amendments' sponsor, Representative Donley. As Donley stated, the amendments were prompted by the fact that "people weren't getting what they thought they were when buying uninsured/underinsured motorist coverage." Minutes, Senate Labor and Commerce Committee, May 2, 1990, at 13.

In regard to this purpose, subsection (h) falls far short of the mark: it seems virtually unimaginable that a typical consumer selecting a given level of UIM protection would expect to receive a lottery-like coverage in which the insured bets double or nothing against the unpredictable odds of injury by a motor vehicle with lower liability limits than the limits selected for the UIM policy. Retaining subsection (h) would stand in obvious conflict with the statutory purpose of upholding consumer expectations.

A consistent theme of Progressive's argument to the contrary is that the meaning of AS 28.20.445 is plain on its face and that there is no logical inconsistency between its recently revised subsections and the original form of subsection (h). As we have already established, however, plain meaning does not trump clear legislative history to the contrary. *See Towsley*, 841 P.2d at 1043–44; *Peninsula Mktg. Ass'n*, 817 P.2d at 922. Nor does implied repeal require irreconcilable conflict between the literal terms of a new and old enactment. Instead, the status of prior legislation must be gauged by reference to the legislative purpose of the new provision: "If enforcement of the prior statute is in irreconcilable conflict with such purpose, it will be held to have been impliedly repealed." *Peter*, 531 P.2d at 1268.

Our consideration of legislative history and statutory purpose persuades us that subsection (h) is fundamentally incompatible with the 1990 amendments to AS 28.20.445.[10]

---

9. *See, e.g., Starry v. Horace Mann Ins. Co.,* 649 P.2d 937, 939 (Alaska 1982); *Stracener,* 777 S.W.2d at 383–84.

10. Our conclusion finds reinforcement in two cases from other states with similar schemes of UIM coverage.

In *Shelby Mutual Insurance Co. of Shelby, Ohio v. Smith,* 556 So.2d 393 (Fla.1990), a divided Florida Supreme Court, interpreting an amended UIM coverage statute that mirrors AS 28.20.445, declined to find implied repeal of a provision defining "uninsured motor vehicle" as a vehicle

Subsection (h) seems inoffensive when viewed in isolation. But the provision makes little sense when read in conjunction with the entirety of AS 28.20.445. Because subsection (h) conflicts with the purpose of the 1990 amendments to subsections (a) and (b), these amendments must be deemed to have worked a repeal by implication.

### D. Does AS 28.20.445 Apply to Simmons's Case?

One additional point requires our attention. Alaska Statute 28.20.445 is a provision of the Motor Vehicle Safety Responsibility Act (MVSRA), which is codified as Title 28, chapter 20 of the Alaska Statutes. Progressive raises a conclusory argument that AS 28.20.445 does not apply to this case at all, because Progressive's policy is not subject to the mandatory filing provisions of the MVSRA. Progressive submits that the MVSRA does not apply here because "this policy was not certified or required as proof of financial responsibility." According to Progressive, the case is instead governed by the Alaska Mandatory Automobile Insurance Act (AMAIA), which is codified as Title 28, chapter 22 of the Alaska Statutes.

■ This argument requires a brief explanation of the two acts. The MVSRA is not a mandatory insurance law. *See Evron v. Gilo,* 777 P.2d 182, 187 (Alaska 1989) (purchase of automobile liability insurance encouraged, not compelled); *Johnson v. U.S.*

*Fidelity & Guar. Co.,* 601 P.2d 260, 264 n. 3 (Alaska 1979). Enacted in 1959, *see* ch. 163, § 2, SLA 1959, the act requires an uninsured driver who has been involved in an accident to prove financial responsibility for the future, either by posting a bond or submitting a certificate of insurance. *See* AS 28.20.050; *Hart v. National Indem. Co.,* 422 P.2d 1015, 1021 (Alaska 1967).

The act also requires that insurance policies issued to comply with its proof requirements contain certain provisions including uninsured and underinsured motor vehicle coverage. *See* AS 28.20.440(b)(3). In 1968 legislation was enacted which required that all policies issued in the state meet the content requirements imposed by the MVSRA, regardless of whether the policies were required as proof under the act. *See* ch. 105, SLA 1968. The 1968 act, which was codified as AS 21.89.020, expressly referred to subsection 28.20.440(b)(3) of the MVSRA, which required uninsured motor vehicle coverage unless waived in writing by the insured. *See* ch. 146, § 2, SLA 1966. Although the MVSRA has never been a mandatory insurance law, as of 1968 the act's policy content requirements became mandatory for all policies written in the state.

In contrast to the MVSRA, the AMAIA, enacted in 1989 (*see* ch. 108, SLA 1989), does compel insurance coverage. *See* AS 28.22.011.[11] Although the AMAIA's coverage

---

with liability limits less than applicable limits of the injured party's uninsured motorist coverage. The statutory background of the Florida definition was similar to that of Alaska's subsection (h): Florida's definition had been left intact by a 1984 amendment substituting excess coverage for reduction coverage. *Id.* at 394. In rejecting implied repeal, the Florida Supreme Court expressly relied on Florida's tradition of adherence to the plain meaning rule of statutory interpretation, which precluded it from considering the statute's legislative history—history that, in the court's view, made it clear that the 1984 amendment was intended to permit stacking of UIM coverage. *Id.* at 395. The Florida Legislature subsequently amended the definition to include vehicles with liability coverage "less than the total damages sustained by [the injured party]." Fla.Rev.Stat. § 37.627.727(3)(b).

And in *Pristavec v. Westfield Insurance Co.,* 184 W.Va. 331, 400 S.E.2d 575 (1990), the West Virginia Supreme Court, construing a UIM stat-

ute whose provisions and history were comparable to those of AS 28.20.445, found implied repeal of a definition of "underinsured motor vehicle" that was virtually indistinguishable from that set out in subsection (h) of the Alaska statute. *Id.,* 400 S.E.2d at 581–82.

11. Although the Alaska Mandatory Automobile Insurance Act was enacted in 1989, Alaska's first mandatory insurance act was enacted in 1984 and was effective beginning January 1, 1985. *See* ch. 70, § 13, SLA 1984. The 1984 mandatory insurance act was generally similar to the current mandatory insurance act with respect to required policy provisions, limits, and coverage. The 1984 act, however, provided for its own repeal as of January 1, 1989. *See* ch. 70, § 17, SLA 1984. The repeal took effect. Thus from January 1, 1989, until June 14, 1989, when the current mandatory insurance act took effect, Alaska did not have a mandatory insurance requirement. During that period, of course, and as

limits generally parallel those of the MVSRA,[12] the two acts are not coextensive.[13] Thus, the MVSRA and the AMAIA coexist as components of the Alaska Uniform Vehicle Code. *See* AS 28.40.110. The mandatory act supplements, but does not supplant, the MVSRA.[14]

For present purposes, one other potentially significant feature distinguishes the two acts. Prior to 1990, the AMAIA's UIM coverage provisions conformed to the MVSRA's. Yet when the legislature amended the UIM provisions of the MVSRA in 1990, it did not enact corresponding amendments to the AMAIA. The AMAIA thus continued to employ the reduction approach to UIM coverage that AS 28.20.445 also originally embodied.[15] And this scheme of coverage was subject to a definition of "underinsured motor vehicle" conforming to the definition set out in AS 22.20.445(h). *See* former AS 28.40.100(a)(22). Thus, by arguing that the MVSRA is inapplicable to this case and suggesting that the case is instead governed by the AMAIA, Progressive seeks application of essentially

the same reduction coverage originally reflected in AS 28.20.445(a) and (b).

Progressive's argument is unpersuasive. First, the UIM provision of the policy itself tracks almost verbatim the language of the MVSRA, AS 28.20.445, instead of the language of the AMAIA. Moreover, the language of the Progressive policy indicates that the policy was drafted in a manner intended to conform to the requirements of the MVSRA in the event certification as proof of financial responsibility might sometime be necessary.[16] Hence, there is good reason to conclude that the policy was meant to be interpreted consistently with current interpretations of the MVSRA's parallel provisions.

Second, the fact that the Progressive policy was not required as proof of financial responsibility under the MVSRA does not mean that the provisions of the policy were not required to conform to the policy content provisions of that act. As we have seen, since 1968 all policies of insurance written in the state have had to comply with the MVSRA's requirements.

anticipated in the 1984 act, the MVSRA remained in effect. *See* ch. 70, §§ 18, 19, 20, SLA 1984 (effective January 1, 1989).

**12.** *Compare, e.g.,* AS 28.20.440 and AS 28.20.445 *with* AS 28.22.101 and AS 28.22.201.

**13.** The MVSRA applies statewide to drivers and owners of all vehicles subject to registration in Alaska, *see* AS 28.20.050(a), but the act generally requires insurance only after a driver's first accident. *See* AS 28.20.010, .060, .070. On the other hand, the mandatory insurance act does not require an accident before requiring insurance, but it does not apply to persons who have not within five years received a citation for a serious traffic violation who drive in certain areas of Alaska that are unconnected by road to the state highway system. *See* AS 28.22.011. Under the mandatory act, a motor vehicle operator involved in an accident involving personal injury or property damage must show that the operator was insured at the time of the accident. *See* AS 28.22.021. If the operator fails to make this showing, the operator's driver's license is suspended for a specified period. For a first offense the period of suspension is not less than ninety days. *See* AS 28.22.041(a)(1). A person whose license is suspended under the mandatory act is required to file proof of insurance under the MVSRA before his or her driving privileges may be restored. *See* AS 28.22.061. This proof must

be maintained for a period of three years following the expiration of the suspension. *See id.*

**14.** Despite these differences—perhaps because the MVSRA and the AMAIA are largely overlapping—our past decisions have sometimes failed to distinguish the two acts and have tended to treat them interchangeably. *See, e.g., Hughes v. Harrelson,* 844 P.2d 1106 (Alaska 1993).

**15.** *See* former AS 28.22.211. As we have noted, *see supra* note 5, the legislature has now repealed section 211 of the AMAIA. *See* ch. 81, § 115, SLA 1997. The result of the recent repeal of this section is that the current versions of the AMAIA and the MVSRA both conform to the excess coverage approach.

**16.** Under "Part I—Liability" the policy provides:
**Financial Responsibility Laws -**
When WE certify this policy as proof of Financial Responsibility, it will comply with the minimum Financial Responsibility requirements, and only those minimums, in the state where the policy is certified. YOU agree to repay U.S. for any payment made which WE would not have made if this policy were not certified as proof of Financial Responsibility.
This language would appear to be "an agreement ... to conform with the requirements of [the MVSRA]," which would qualify the policy to "be certified as proof of financial responsibility under [the MVSRA]." AS 28.20.460(a).

Finally, prior to the mandatory insurance act of 1989, AS 21.89.020(c) read as follows:

> An insurance company offering automobile liability insurance in this state for bodily injury or death shall offer coverage prescribed in AS 28.20.440 and 28.20.445 ... for the protection of the persons insured under the policy who are legally entitled to recover damages for bodily injury or death from owners or operators of uninsured or underinsured motor vehicles.

The mandatory act changed this by adding the phrase "or AS 28.22" after "28.20.445." *See* ch. 108, § 5, SLA 1989.[17]

■ How should this language be interpreted where the contents of policies required under the mandatory act differ from the content requirements of the MVSRA? In our view, this language means that all policies in the state must continue to conform to the content requirements of the MVSRA, and that if the content requirements of the mandatory act are broader than those of the MVSRA, those requirements must also be complied with as to persons covered by the mandatory act.

■ This construction is consistent with the legislative intent that the two acts coexist as part of a uniform vehicle code. It recognizes that the legislature has superimposed a mandatory insurance system, which does not apply to all drivers, on a non-mandatory system, which does apply to all drivers. Absent some indication of legislative intent that the comprehensive application of the MVSRA to all drivers was meant to be limited by the mandatory act, we conclude that the scope of the MVSRA's application was not limited by the mandatory act.

■ Since at the time of Simmons's accident, the MVSRA afforded broader coverage with respect to UIM coverage than the mandatory act did, it follows that the MVSRA governs interpretation of the policy's UIM coverage in this case.

---

**17.** We note that the current mandatory act, like that enacted in 1984, contained prospective repeal provisions, effective January 1, 1994. *See* ch. 108, § 31, SLA 1989. The MVSRA was not subject to prospective repeal, and the legislature contemplated its continued application regardless of the possibility of repeal of the mandatory

## IV. CONCLUSION

The superior court's order granting summary judgment to Simmons is AFFIRMED.

act. *Compare* ch. 108, §§ 3, 5, 7, SLA 1989, which were effective June 14, 1989, *with* §§ 4, 6, 8 of the same chapter, which were to take effect January 1, 1994. The prospective repeal provision of the 1989 act was itself repealed in 1992. *See* ch. 26, § 2, SLA 1992.