147 P.3d 664 (2006)
Monte J. ALLEN, Dr. George Kasper, Danco International Oil & Gas, Inc., and Danco Royalty Partnership Ltd., Appellants,
v.
ALASKA OIL AND GAS CONSERVATION COMMISSION, ConocoPhillips Company, and ConocoPhillips Alaska, Inc., Appellees.
No. S-11519.
Supreme Court of Alaska.
July 21, 2006.
Rehearing Denied November 30, 2006.
*665 James B. Gottstein, Law Offices of James B. Gottstein, Anchorage, for Appellants.
Robert E. Mintz, Assistant Attorney General, Anchorage, and Scott J. Nordstrand, Acting Attorney General, Juneau, for Appellee Alaska Oil and Gas Conservation Commission.
William B. Rozell, Juneau, and Barbara F. Fullmer, ConocoPhillips Alaska, Inc., Anchorage, for Appellees ConocoPhillips Company and ConocoPhillips Alaska, Inc.
Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

OPINION
CARPENETI, Justice.
I. INTRODUCTION
Monte Allen, George Kasper, and Danco International Oil & Gas, Inc. (collectively Allen) obtained oil and gas exploration leases in 1986. Allen retained the overriding royalty interest while the working interest in the leases was transferred to several oil companies, eventually coming under the sole control of ConocoPhillips. Although the leases are near the state's most productive gas field, the North Cook Inlet Unit (NCIU), no oil or gas has been produced from the leases. One day before the leases were to expire, Allen petitioned the Alaska Oil and Gas Conservation Commission (commission) for a unitization order combining his leases into the NCIU and thus entitling him to a share of royalties from the NCIU.
After intervening litigation on the justiciability of the petition, the commission denied Allen's unitization petition on the merits. Upon thorough and thoughtful review, the superior court denied Allen's request for a trial de novo and then affirmed the commission's decision on appeal. Allen's appeal raises three main questions: (1) Is Allen entitled to a trial de novo as provided in AS 31.05.080? (2) Did the commission apply the proper statutory standard to Allen's unitization petition? (3) Did the commission breach any statutory duty to Allen? Because we conclude that Allen is not entitled to a trial de novo, that the commission applied the *666 proper statutory standard to Allen's petition, and that the commission did not breach any statutory duty to Allen, we affirm the judgment of the superior court.
II. FACTS AND PROCEEDINGS
A. Facts
This case comes before us after protracted litigation. Danco, Inc., entered into two ten-year oil and gas leases with the State of Alaska on September 1, 1986.[1] Danco assigned its working interest in the leases to Amoco Production Co., which in turn assigned that interest to ARCO Alaska, Inc. In 1992 Phillips Petroleum Co. obtained forty percent of the working interest in the leases from ARCO Alaska. After a series of mergers, ConocoPhillips Co. and its subsidiary, ConocoPhillips Alaska, Inc. (collectively ConocoPhillips)[2] came to own the entire working interest.[3] Danco's successor, appellant Danco International Oil & Gas, Inc., is an overriding royalty interest owner in the leases, as are co-appellants Monte Allen and George Kasper.[4]
On August 30, 1996  the day before the leases were to expire  Allen filed a petition for compulsory unitization with the commission, asking that the commission use its authority under AS 31.05.110 to merge the leases into the existing NCIU adjacent to the south and west of the leases. Unitization would entitle Allen to a share of the oil and gas royalties for the entire unit rather than solely for its own leases.[5] The NCIU is the leading natural gas field in Alaska, having produced nearly 1.7 trillion cubic feet as of March 2005. Allen argues that estimated reserves doubled since the unit was established, indicating that gas is being produced from under his leases. The commission found that estimated reserves had not appreciably increased since 1975, eleven years before Danco purchased its interest.
The commission denied Allen's petition on the grounds that he lacked standing as an overriding royalty interest owner and that the petition was moot since the lease had expired and the commission lacked the power to order retroactive unitization. After the superior court affirmed, we reversed, holding that the overriding royalty interest made Allen an "interested person" with standing to petition for unitization,[6] and holding that "no sound reason" justified the commission's position that it had no power to order retroactive *667 unitization.[7] We remanded to the commission for a hearing on the merits of the unitization petition.[8]
B. Proceedings
On remand, the commission denied Allen's petition, issuing the final decision on February 8, 2002. ConocoPhillips, as the working interest owner, also appeared as a party before the commission. The commission found, among other things, that the leases "do not contain any portion" of the productive reservoir of the NCIU, that unitization would not advance the management of NCIU reservoirs, and that "[n]one of the statutory requirements" for compulsory unitization had been met. The commission reaffirmed its decision after a limited rehearing. Allen appealed to the superior court. Allen moved for a trial de novo but the superior court denied the motion. Allen then filed a petition for review, which we denied.[9] The superior court subsequently affirmed the commission's decision. Allen appeals.
III. STANDARD OF REVIEW
When the superior court acts as an intermediate appellate court, we undertake an independent review of the agency determination, and may affirm the decision below on any ground supported by the record.[10] We review questions of law, including statutory interpretation, using our independent judgment, and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[11] We review agency findings of law requiring agency expertise under the reasonable basis standard.[12] We review agency findings of fact for substantial evidence.[13] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[14]
IV. DISCUSSION
A. Allen Is Not Entitled to a De Novo Superior Court Trial Under AS 31.05.080.
Allen argues that AS 31.05.080(b) entitles him to a de novo trial in the superior court on any legal or factual issues remaining after the disposition of this appeal. Alaska Statute 31.05.080(b) provides, in relevant part:
A party to the rehearing proceeding . . . may appeal from it to the superior court. . . . The trial upon appeal shall be without a jury, and the transcript of proceedings before the commission, including the evidence taken in hearings by the commission, shall be received in evidence by the court . . . in the same manner as if the evidence was originally offered in the superior court. . . . The court shall determine the issues of fact and of law and shall . . . enter its order either affirming or vacating the order of the commission.[[15]]
The commission argues that AS 31.05.080 is impliedly repealed by the enactment of AS 22.10.020(d), which provides that "[t]he superior court has jurisdiction in all matters appealed to it from a[n] . . . administrative agency when appeal is provided by law. . . . The hearings on appeal . . . shall be on the record unless the superior court, in its discretion, grants a trial de novo, in whole or in part." Allen disputes that AS 31.05.080 was repealed by implication because the legislature repeatedly had the chance to repeal the statute expressly but declined to do so. As *668 Allen notes, the Twenty-Third Legislature considered but did not enact a bill expressly repealing AS 31.05.080(b)'s procedures for a new trial.[16] For the reasons set out below, we agree with the commission that AS 22.10.020(d) impliedly repealed AS 31.05.080(b).
Alaska does not retain the traditional presumption against repeal by implication, but instead looks to legislative intent.[17] In Peter v. State,[18] we held that "we should not commence with a presumption against implied repeal. We shall look to the purpose indicated by the legislature. . . . If enforcement of the prior statute is in irreconcilable conflict with such purpose, it will be held to have been impliedly repealed."[19] In Progressive Insurance Co. v. Simmons,[20] we noted that "Alaska has recognized that this presumption [against implied repeal] is artificial and potentially at odds with the primacy of legislative intent. . . ."[21] Two potentially conflicting statutes, we said, must be interpreted "with a view toward reconciling conflict and producing `a harmonious whole.'"[22] In general, if two statutes conflict, then the later in time controls over the earlier, and the specific controls over the general.[23] At every step, however, "[l]egislative intent is the key."[24]
We have recognized that an implied repeal is possible when a statute completely occupies the field of a previous statute. In Peter, we stated that "if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate . . . as a repeal of the earlier act."[25] Here there is sufficient evidence that the legislature intended its enactments to be uniform and that AS 31.05.080(b) should yield. As was the case in Keiner v. City of Anchorage,[26] the enactment of the later statute shows an "obvious intent" that the field be occupied.[27]
In Keiner, the Anchorage City Council, acting as a "board of adjustment," found Keiner's building to be a nuisance and ordered it demolished.[28] Keiner appealed to the superior court, requesting a de novo jury *669 trial.[29] The request was denied.[30] Keiner argued before us that a 1949 statute granted him a right to de novo trial.[31] Similarly, Allen argues on the basis of Keiner that the legislature intended only to restrict de novo trials where the statutory grant of such a trial was procedural rather than substantive. Allen misreads Keiner, for in that case, citing in part to the language that now constitutes AS 22.10.020(d), we held that the 1949 statute had been impliedly repealed. We said that the 1949 statute "does not govern the procedure in the superior court."[32] We discerned "an obvious intent that where appeals are taken from administrative agencies or magistrate courts there shall not be a trial de novo unless the superior court requires it."[33] "This procedure," we noted, "simplifies and expedites the handling of appeals."[34]Keiner thus stands for the proposition that the jurisdictional statute, AS 22.10.020(d), explicitly overrode any previous ad hoc appeal procedures.
Allen argues that the legislature's thirteen amendments of AS 31.05, none of which altered AS 31.05.080(b), indicate the legislature's reaffirmance of that subsection. The commission and ConocoPhillips respond that legislative inaction is a "weak reed" to lean on in construing a statute. This is especially true, they argue, when the legislature was on notice that AS 31.05.080(b) had likely been superseded. Furthermore, as all parties agree, the commission ceased to exist as an independent agency between 1959 and 1978;[35] during that period it was a unit of the Department of Natural Resources (DNR). Thus the agency as envisioned by AS 31.05.080(b) was abolished at the time of statehood.
The legislature's inaction admits of two plausible interpretations. First, that the legislature entertained no concern as to AS 31.05.080(b), assuming that generalized appeal procedures would apply to the commission as well. Second, that the legislature was aware of AS 31.05.080(b)'s import and opted to retain it. The introduction of repeal legislation in the Twenty-Third Legislature would militate in favor of the second interpretation if there were any indication that the full legislature had considered and rejected the bill.[36] It appears, however, that the bill was only read once and that no committee hearings were held.[37] We therefore favor the first interpretation, especially since the legislature subjected the commission, while it was part of the DNR, to the Administrative Procedure Act.[38] Although the legislature declined to subject the reconstituted commission to the Act,[39] nothing indicates a legislative intent to exclude the commission from the procedures specified by AS *670 22.10.020(d). Furthermore, it seems that a right to trial de novo would be wholly inconsistent with the legislature's creation of an independent commission with a great deal of technical expertise.
The superior court held that AS 31.05.080 did not grant Allen a new trial because "the Alaska Rules of Appellate Procedure state that the appellate rules supercede all other procedural methods specified in the Alaska statutes for appeals from administrative agencies to courts." Allen argues that AS 31.05.080 grants a substantive right to de novo trial, thus placing his petition beyond the ambit of the Appellate Rules. Because we conclude that AS 31.05.080 was impliedly repealed by the enactment of AS 22.10.020, we decline to address the interplay between AS 31.05.080 and the Appellate Rules. Any rights granted by AS 31.05.080, whatever their nature, were extinguished along with the statute.
Although Allen argued to the superior court in the alternative that he was entitled to de novo trial under constitutional due process or the superior court's discretion, he does not appeal the superior court's denial of de novo trial on those grounds. Thus we have no occasion to review Allen's due process claims or to review the superior court's exercise of its discretion.
B. The Commission Applied the Proper Statutory Standard in Reaching Its Decision on Unitization.
Allen argues that the commission, in making its determination whether unitization was warranted, applied the wrong statutory standard. The commission applied AS 31.05.110, which by its terms deals with involuntary unitization. Allen argues that the commission was required by AS 31.05.110(q) to apply the standards of AS 38.05.180 instead. Alaska Statute 38.05.180, which is administered by the DNR, applies to voluntary unitization.
The statute that the commission applied, AS 31.05.110, has a number of relevant subsections. The first, subsection (a), provides that the commission "has jurisdiction, power and authority, and it is its duty to make and enforce orders" for unitization even where the owners of a pool do not agree. Subsection (b) lays out the four criteria for involuntary unitization.[40] Subsection (c) provides that "[o]nly so much of a pool or pools as has been defined and determined to be productive on the basis of information available to the commission may be so included within the unit area." This subsection goes on to prescribe detailed procedures for establishing and administering a unitization plan. Subsection (o) states that expansion of a unit may proceed on the same basis as formation. Finally, subsection (q) states that "[t]his section applies to all involuntary units formed in the state. Subsections (a) and (g)-(p) of this section apply to all voluntary units formed in the state and to a voluntary cooperative or unit plan of development or operation entered into in accordance with AS 38.05.180(p)."
On the basis of subsection (q), Allen argues that, since the NCIU was originally established voluntarily, the commission should have applied the standards of AS 38.05.180(p) and related regulations. Alaska Statute 38.05.180(p) authorizes DNR to approve voluntary unitization by holders of DNR leases under criteria more relaxed than those of AS 31.05.110.[41] The relevant DNR regulations *671 are also more permissive, referring to "potential hydrocarbon accumulations" rather than requiring, as does AS 31.05.110(b), "substantially more oil and gas from the pool than would otherwise be recovered."[42] By its terms, however, AS 38.05.180(p) applies only to voluntary unitization. Allen does not have the consent of other members of the unit. The DNR may approve or deny a unitization request, but appears to have no authority to order unitization.
Allen seems to be arguing that, since the NCIU was originally established voluntarily, the commission should have evaluated his unitization petition under the standards that the DNR uses to evaluate requests for voluntary unitization. But Allen is seeking involuntary unitization. Whether the NCIU was originally established voluntarily or involuntarily is of no moment. Though AS 31.05.110(b) applies only to "involuntary units," any order by the commission would create a new involuntary unit composed of the NCIU and the Allen leases rather than simply expanding the size of the NCIU.[43] Thus the commission correctly applied AS 31.05.110. As the superior court stated, "Subsection (q) merely directs voluntary versus involuntary inquiries towards respective subsections, and reinforces the separation between the Commission and the DNR."
Allen already had a chance to invoke AS 38.05.180. Prior to the commission's hearing on remand, DNR invited Allen to apply under AS 38.05.180(p) for unit expansion. Allen declined the invitation. We decline to renew it.
C. The Commission's Factual Findings Were Supported by Substantial Evidence.
The commission argues that we need not consider whether its factual determinations were based on substantial evidence because Allen has failed to challenge the commission's findings before this court. Indeed, Allen's attorney conceded at oral argument that substantial evidence exists, remarking that "we live or die on the de novo trial issue." We note, however, that many of Allen's arguments contain implicit challenges to the existence of substantial evidence. In any case, the commission has exhaustively explored the issue. Its finding that no part of either productive reservoir extended under the leases was supported by extensive testimony and review of proprietary seismic data. The record contains thousands of pages of pre-filed testimony and data, the vast majority of which supports the commission's findings. We are thus of the firm belief that the commission's factual findings were supported by substantial evidence.
D. The Commission Did Not Breach Any Statutory Duties To Investigate or Protect.
Allen argues that the commission, by denying his petition, breached its duty to "protect the correlative rights of persons owning interests in the tracts of land affected."[44] Correlative rights are the rights of owners of property overlying a pool or *672 aquifer to a correspondent share of the minerals or subsurface water. In Alaska oil and gas law, correlative rights are defined as
the opportunity afforded, so far as it is practicable to do so, to the owner of each property in a pool to produce without waste the owner's just and equitable share of the oil or gas, or both, in the pool; being an amount, so far as can be practically determined, and so far as can practicably be obtained without waste, substantially in the proportion that the quantity of recoverable oil or gas, or both under the property bears to the total recoverable oil or gas or both in the pool, and for such purposes to use the owner's just and equitable share of the reservoir energy. . . . [[45]]
Alaska law gives the commission authority to protect these correlative rights by requiring "a plan of development and operation for a field or pool."[46]
The commission found that Allen's leases "do not contain any portion of the Tertiary System Gas Pool," which is the only producing pool in the NCIU, and that the leases "have not been shown to contain any portion of the Tyonek Deep reservoir," the only other known oil or gas reservoir in the NCIU. The commission thus found unambiguously that Allen's leases are not being drained. Since correlative rights attach to "the owner of each property in a pool,"[47] Allen must have an interest in that pool before he can assert correlative rights. As there is no drainage from Allen's leases, there is no need to consider whether correlative rights attach to Allen's overriding royalty interest.
Allen also argues that the commission breached its duties under AS 31.05.110 to protect Allen's rights as an overriding royalty owner. Aside from the issue of correlative rights, discussed above, Allen argues that the commission breached its duties by failing to order unitization under AS 38.05.180(p). The commission responds that it breached no duties, and made no holdings about the extent of overriding royalty owners' rights; it merely declined to consider the full extent of the rights because there were no reserves underlying Allen's land. As discussed above, the commission properly considered Allen's petition under AS 31.05.110(b). In doing so, the commission performed rather than breached its statutory duty to "make and enforce orders" in order to "prevent . . . waste, insure a greater ultimate recovery of oil and gas, and protect the correlative rights of persons owning interests in the tracts of land affected. . . . "[48]
Finally, Allen hints that the commission had potential conflicts of interest, noting that the commission and the Department of Natural Resources are both represented by the Department of Law. While it may be true that the commission has not been receptive to Allen's position, especially in the proceedings leading up to Allen I, Allen has not shown a conflict that should exclude the commission from hearing the case.
V. CONCLUSION
The superior court correctly denied Allen's motion for a trial de novo. The commission applied the proper statutory standard to Allen's petition. The commission did not breach any duties owed to Allen. We therefore AFFIRM the judgment of the superior court.
NOTES
[1] The leases are designated Alaska Development Leases 369100 and 369101.
[2] ConocoPhillips Co. owns forty percent of the working interest while ConocoPhillips Alaska, Inc. owns sixty percent. ConocoPhillips Alaska is a subsidiary of ConocoPhillips Co.
[3] ConocoPhillips was known as Phillips Petroleum until 2002. Phillips Petroleum purchased ARCO Alaska in 2000, renaming it Phillips Alaska, Inc. Phillips Alaska has been known as ConocoPhillips Alaska, Inc. since 2002.
[4] The original petition to the commission was brought by Allen and Danco. The present appeal is brought by Allen, Kasper, and Danco International Oil & Gas, and Danco Royalty Partnership Ltd. These parties collectively are referred to as "Allen" in this opinion.
[5] Alaska Statute 31.05.110(c) describes the procedures for unitization:

[E]ach plan of unitization shall contain fair, reasonable and equitable provisions for . . . (2) the division of interest or formula for the apportionment and allocation of the unit production, among and to the several separately owned tracts within the unit area such as will reasonably permit persons otherwise entitled to share in or benefit by the production from such separately owned tracts to produce and receive, instead thereof, their fair, equitable and reasonable share of the unit production or other benefits of it; a separately owned tract's fair, equitable, and reasonable share of the unit production shall be measured by the value of each such tract for oil and gas purposes and its contributing value to the unit in relation to like values of other tracts in the unit, taking into account acreage, the quantity of oil and gas recoverable from it, location on the structure, its probable productivity of oil and gas in the absence of unit operations, the burden of operations to which the tract will or is likely to be subjected, or so many of these factors, or such other pertinent engineering, geological or operating factors as may be reasonably susceptible of determination; "unit production" as that term is used in this chapter means all oil and gas produced from a unit area from the effective date of the order of the commission creating the unit regardless of the well or tract within the unit area from which the same is produced. . . .
[6] Allen v. Alaska Oil & Gas Conservation Comm'n, 1 P.3d 699, 701-02 (Alaska 2000) (Allen I).
[7] Id. at 703.
[8] Id. at 705.
[9] Danco Int'l Oil & Gas, Inc. v. Alaska Oil & Gas Conservation Comm'n, No. S-10927 (order of March 14, 2003).
[10] Conkey v. State, Dep't of Admin., Div. of Motor Vehicles, 113 P.3d 1235, 1237 (Alaska 2005); Leuthe v. State, Commercial Fisheries Entry Comm'n, 20 P.3d 547, 550 (Alaska 2001).
[11] Alaska Civil Liberties Union v. State, 122 P.3d 781, 785 (Alaska 2005); see also State v. Dupier, 118 P.3d 1039, 1044 (Alaska 2005).
[12] Leuthe, 20 P.3d at 550.
[13] Id.; Conkey, 113 P.3d at 1237.
[14] George Easley Co. v. Estate of Lindekugel, 117 P.3d 734, 740 (Alaska 2005) (internal quotation marks omitted); Thornton v. Alaska Workmen's Comp. Bd., 411 P.2d 209, 210 (Alaska 1966).
[15] AS 31.05.080(b); ch. 40, § 11, SLA 1955.
[16] House Bill (H.B.) 290, 23rd Leg., 1st Sess. (2003).
[17] Compare 1A NORMAN SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 23:9, at 459-60 ("A statute cannot be interpreted as abrogating existing law by implication alone") (6th ed.2002 rev.) with Warren v. Thomas, 568 P.2d 400, 403 (Alaska 1977) ("The implied repeal of an act is disfavored and will be limited to that which is necessary to carry out the intent of the legislature.").
[18] 531 P.2d 1263 (Alaska 1975).
[19] Id. at 1268.
[20] 953 P.2d 510 (Alaska 1998).
[21] Id. at 516.
[22] Id. (quoting City of Anchorage v. Scavenius, 539 P.2d 1169, 1174 (Alaska 1975)).
[23] Compare SINGER, § 23:9, at 459 ("when two statutes are repugnant . . . the later act . . . operates to the extent of the repugnancy to repeal the first") with id. at 460 ("standard statutory construction requires that a court adopt as controlling that provision more closely associated with the specific substance of the controversy").
[24] Simmons, 953 P.2d at 516 (quoting Hafling v. Inlandboatmen's Union of the Pac., 585 P.2d 870, 876 n. 20).
[25] Peter, 531 P.2d at 1267. See also SINGER, § 23:9, at 471-74 ("When a subsequent enactment covering a field of operation co-existent with a prior statute cannot by any reasonable construction be given effect while the prior law remains in existence because of irreconcilable conflict between the two acts, the later legislative expression prevails and the prior law yields to the extent of the conflict.").
[26] 378 P.2d 406 (Alaska 1963).
[27] Id. at 410. Our decision in Matanuska-Susitna Borough v. Lum, 538 P.2d 994 (Alaska 1975), issued several months after Peter, did not determine whether special statutes can be repealed by general statutes. Lum offered the unusual circumstance in which the legislature enacted a specific guarantee of de novo review of school board decisions for tenured teachers, then re-enacted the generally applicable statute under which de novo review is left to the superior court's discretion. However, the general statute was already present when the legislature created the specific guarantee for tenured teachers. Lum, 538 P.2d at 998-1001. Thus, the legislative history in Lum indicated an intent to create a specific right for tenured teachers as an exception to the existing general procedure.
[28] Keiner, 378 P.2d at 408.
[29] Id.
[30] Id.
[31] Id. at 410; former AS 29.10.213-.243.
[32] Keiner, 378 P.2d at 410.
[33] Id.
[34] Id.
[35] Ch. 64, § 16, SLA 1959 (creating Department of Natural Resources and transferring to it commission's "function and authority"); ch. 158, § 1, SLA 1978; AS 31.05.005 (re-establishing commission as independent agency); ch. 158, § 5, SLA 1978 (changing statutory references from DNR to commission).
[36] H.B. 290, 23rd Leg., 1st Sess. (2003). The bill provided:

Section 1. AS 31.05.080(b) is repealed and reenacted to read:
(b) A party to the rehearing proceeding who is dissatisfied with the disposition of the application for rehearing may appeal from the decision as to the disposition to the superior court. The questions reviewed on appeal are limited to the questions presented to the commission by the application for rehearing.
* Sec. 2. AS 31.05.025(b), 31.05.080(c), and 31.05.080(d) are repealed.
* Sec. 3. This Act takes effect immediately under AS 01.10.070(c).
[37] See 2003 House Journal 1202.
[38] Former AS 44.62.330(a)(18), repealed by ch. 94, § 49, SLA 1980 (subjecting to the APA the "Department of Natural Resources as to functions relating to the conservation of oil and gas").
[39] Ch. 94, § 49, SLA 1980 (effective Sept. 17, 1980) (repealing former AS 44.62.330(a)(18)). This was followed by a major revision of the Appellate Rules. See SCO 439, Nov. 15, 1980 (enacting Alaska R.App. P. 601-611 (providing in part for appeals to the superior court from administrative agencies)).
[40] The four criteria are:

(1) the unitized management, operation and further development of a pool or portion of a pool is reasonably necessary in order to effectively carry on pressure control, pressure-maintenance or repressuring operations, cycling operations, water flooding operations, or any combination of these, or any other form of joint effort calculated to substantially increase the ultimate recovery of oil and gas from the pool; (2) one or more of the unitized methods of operation as applied to the pool or portion of it is feasible, and will prevent waste and will with reasonable probability result in the increased recovery of substantially more oil and gas from the pool than would otherwise be recovered; (3) the estimated additional cost, if any, of conducting such operations will not exceed the value of the additional oil and gas so recovered; and (4) the unitization and adoption of one or more of the unitized methods of operation is for the common good.
[41] AS 38.05.180(p) provides:

To conserve the natural resources of all or a part of an oil or gas pool, field, or like area, the lessees and their representatives may unite with each other, or jointly or separately with others, in collectively adopting or operating under a cooperative or a unit plan of development or operation of the pool, field, or like area, or a part of it, when determined and certified by the commissioner to be necessary or advisable in the public interest. The commissioner may, with the consent of the holders of leases involved, establish, change, or revoke drilling, producing, and royalty requirements of the leases and adopt regulations with reference to the leases, with like consent on the part of the lessees, in connection with the institution and operation of a cooperative or unit plan as the commissioner determines necessary or proper to secure the proper protection of the public interest. The commissioner may not reduce royalty on leases in connection with a cooperative or unit plan except as provided in (j) of this section. The commissioner may require a lease issued under this section to contain a provision requiring the lessee to operate under a reasonable cooperative or unit plan, and may prescribe a plan under which the lessee must operate. The plan must adequately protect all parties in interest, including the state.
[42] 11 AAC 83.356(a) provides: "A unit must encompass the minimum area required to include all or part of one or more oil or gas reservoirs, or all or part of one or more potential hydrocarbon accumulations."
[43] See AS 31.05.110(a) & (o).
[44] AS 31.05.110(a).
[45] AS 31.05.170(2).
[46] AS 31.05.030(d)(9).
[47] AS 31.05.170(2).
[48] AS 31.05.110(a).